**No. 25-1043**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

**SUHAIL NAJIM ABDULLAH AL SHIMARI; SALAH HASAN NUSAIF JASIM AL-EJAILI; ASA'AD HAMZA HANFOOSH AL-ZUBA'E,**

Plaintiffs-Appellees,

**and**

**TAHA YASEEN ARRAQ RASHID; SA'AD HAMZA HANTOOSH AL-ZUBA'E,**

Plaintiffs

**v.**

**CACI PREMIER TECHNOLOGY, INC.,**

Defendant and Third-Party Plaintiff – Appellant

**and**

**TIMOTHY DUGAN; CACI INTERNATIONAL INC; L-3 SERVICES, INC.,**

Defendants

**and**

**UNITED STATES OF AMERICA; JOHN DOES 1-60,**

Third-Party Defendants - Appellees.

---

On Appeal from the United States District Court
for the Eastern District of Virginia, Case No. 1:08-cv-00827

---

## BRIEF OF APPELLANT CACI PREMIER TECHNOLOGY, INC.

---

John F. O'Connor
Linda C. Bailey
Joseph T. McClure
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

Nina J. Ginsberg
GREENSPUN SHAPIRO
  GINSBERG & YANG, P.C.
3955 Chain Bridge Road, 2nd Floor
Fairfax, Virginia 22030
(703) 352-0100 – telephone
njg@greenspunlaw.com

*Counsel for Appellant CACI Premier*
*Technology, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Appellant CACI Premier Technology, Inc. is a privately-held company. CACI Premier Technology, Inc.'s parent company is CACI, Inc. – FEDERAL, a privately-held company, and its ultimate parent company is CACI International Inc, a publicly-traded company. No other publicly-traded company has either a 10% or greater ownership interest in CACI Premier Technology, Inc., or a direct financial interest in the outcome of this litigation. There are no similarly situated master limited partnerships, real estate investment trusts, or other legal entities whose shares are publicly held or traded.

*/s/   John F. O'Connor*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

I.      INTRODUCTION ...........................................................................1

II.     JURISDICTION .............................................................................4

      A.    Appellate Jurisdiction ..................................................4

      B.    District Court Jurisdiction ............................................4

III.    ISSUES PRESENTED ...................................................................5

IV.    STATEMENT OF THE CASE ......................................................6

      A.    Procedural History........................................................6

      B.    Statement of Facts ......................................................11

            1.    Direction and Control of CACI Interrogators...........11

            2.    Plaintiffs' Treatment Was a Disputed Issue at Trial...............14

V.     SUMMARY OF ARGUMENT.....................................................16

VI.    ARGUMENT...............................................................................18

      A.    Standard of Review .....................................................18

      B.    The District Court Lacked Subject-Matter Jurisdiction ......................19

            1.    Plaintiffs' Claims Are Impermissibly Extraterritorial .............19

            2.    The District Court Erred in Creating Plaintiffs' Private Damages Actions ...........................................27

            3.    CACI Is Entitled to Derivative Sovereign Immunity ..............31

            4.    Plaintiffs' Claims Implicate Nonjusticiable Political Questions................................................35

      C.    Plaintiffs' Claims Are Preempted .......................................39

      D.    The District Court Erred in Refusing to Dismiss this Case on State Secrets Grounds........................................43

E.    The District Court Erroneously Instructed the Jury and Improperly Denied CACI Judgment on Its Borrowed Servant Defense ................................................................................47

    1.    Supplemental Instruction No. 1 Misstated the Law.................47

    2.    The District Court Erred in Denying CACI Judgment on Borrowed Servant Grounds...........................................................50

F.    The District Court Erred in Not Granting CACI Judgment on Plaintiffs' Conspiracy Counts ...........................................................51

G.    The District Court Erred in Granting the United States Summary Judgment on CACI's Third-Party Claims...........................................56

H.    The District Court Erred in Failing to Grant a New Trial or Remittitur on Damages........................................................................58

    1.    The Jury's Compensatory Damages Award Was Excessive and Speculative ..........................................................................58

    2.    The Jury's Punitive Damages Awards Are Precluded by Binding Precedent, Unconstitutional, and Excessive ..............59

VII.    CONCLUSION.............................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A Soc'y Without a Name v. Virginia*,
   655 F.3d 342 (4th Cir. 2011) ..................................................53

*A.H. v. Church of God in Christ*,
   831 S.E.2d 460 (Va. 2019) ....................................................59

*Abilt v. CIA*,
   848 F.3d 305 (4th Cir. 2017) ..................................................43

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023)..................................................19, 22, 23

*Adhikari v. Kellogg Brown & Root, Inc.*,
   845 F.3d 184 (5th Cir. 2017) ..................................................22

*Agosto v. INS*,
   436 U.S. 748 (1978)..................................................45

*Al Shimari v. CACI Int'l, Inc*,
   658 F.3d 413 (4th Cir. 2011) ..................................................6

*Al Shimari v. CACI Int'l Inc*,
   679 F.3d 205 (4th Cir. 2012) ..................................................3

*Al Shimari v. CACI Premier Tech., Inc.*,
   758 F.3d 516 (4th Cir. 2014) ..................................6, 19-21, 23

*Al Shimari v. CACI Premier Tech., Inc.*,
   775 F. App'x 758 (4th Cir. 2019) ..................................8, 21

*Al Shimari v. CACI Premier Tech., Inc.*,
   840 F.3d 147 (4th Cir. 2016) ..................................6, 37, 38

*Al-Khazraji v. United States*,
   519 F. App'x 711 (2d Cir. 2013) ..................................51

*Estate of Alvarez v. Rockefeller Found.*,
   96 F.4th 686 (4th Cir. 2024) ..................................17, 47-49, 51

iv

*Am. Canoe Ass'n v. Murphy Farms, Inc.*,
  326 F.3d 505 (4th Cir. 2003) ...............................................................28

*Am. Elec. Power Co. v. Connecticut*,
  564 U.S. 410 (2011).............................................................................41

*Am. Recovery Corp. v. Computerized Thermal Imaging*,
  96 F.3d 88 (4th Cir. 1996) ...................................................................56

*Balintulo v. Daimler AG*,
  727 F.3d 174 (2d Cir. 2013) ................................................................27

*Beck v. Prupis*,
  529 U.S. 494 (2000)........................................................................25, 52

*Belhas v. Ya'alon*,
  515 F.3d 1279 (D.C. Cir. 2008)...........................................................32

*Blankenship v. NBCUniversal, LLC*,
  60 F.4th 744 (4th Cir. 2023) ................................................................25

*Bulger v. Hurwitz*,
  62 F.4th 127 (4th Cir. 2023) ..........................................................27, 31

*Burgess v. Goldstein*,
  997 F.3d 541 (4th Cir. 2021) ...............................................................19

*CACI Premier Tech., Inc. v. Al Shimari*,
  141 S. Ct. 2850 (2021)...........................................................................8

*Campbell-Ewald Co. v. Gomez*,
  577 U.S. 153 (2016).............................................................................33

*Chevron U.S.A. Inc. v. United States*,
  155 Fed. Cl. 344 (2021) .......................................................................57

*City of Martinsville v. Express Scripts, Inc.*,
  128 F.4th 265 (4th Cir. 2025) ..............................................................19

*Cline v. Wal-Mart Stores, Inc.*,
  144 F.3d 294 (4th Cir. 1998) ...............................................................19

*Cunningham v. Gen. Dynamics Info. Tech., Inc.*,
    888 F.3d 640 (4th Cir. 2018) ........................................................17, 34

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006).................................................................................18

*Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*,
    601 U.S. 42 (2024)...................................................................................31

*Dept. of the Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999)..................................................................................32

*Djondo v. Holder*,
    496 F. App'x 338 (4th Cir. 2012) .........................................................45

*Doe v. Nestlé, S.A.*,
    906 F.3d 1120 (9th Cir. 2018) .........................................................21, 24

*Dolan v. U.S. Postal Serv.*,
    546 U.S. 481 (2006).................................................................................39

*Dorado-Ocasio v. Averill*,
    ___ F.4th ___, 2025 WL 478406 (4th Cir. 2025).....................1, 2, 36

*Dyer v. Smith*,
    56 F.4th 271 (4th Cir. 2022) .............................................................29, 31

*Edwards v. Am. Med. Ass'n., Inc.*,
    No. 23-2026, 2025 WL 444424 (4th Cir. Feb. 10, 2025)...................52

*EEOC v. Arabian Am. Oil Co.*,
    499 U.S. 244 (1991)........................................................... 20, 24-25

*Egbert v. Boule*,
    596 U.S. 482 (2022).........................................................2, 27, 29, 31

*El-Masri v. United States*,
    479 F.3d 296 (4th Cir. 2007) ..................................... 3, 18-19, 43, 46

*Empire Healthchoice Assur., Inc. v. McVeigh*,
    547 U.S. 677 (2006)................................................................................41

*Financial Oversight and Mgmt. Br. For P.R. v. Centro De Periodismo Investigativo, Inc.*,
   598 U.S. 339 (2023)......................................................................32

*Fomby-Denson v. Dep't of Army*,
   247 F.3d 1366 (Fed. Cir. 2001) ..........................................57

*Foreman v. Dep't. of Army*,
   241 F.3d 1349 (Fed. Cir. 2001) ..........................................56

*Goldstar (Panama) S.A. v. United States*,
   967 F.2d 965 (4th Cir. 1992) .........................................2, 32

*Goodman v. Kimbrough*,
   718 F.3d 1325 (11th Cir. 2013) .........................................54

*Gregg v. Ham*,
   678 F.3d 333 (4th Cir. 2012) ...........................................60

*Harris v. KBR, Inc.*,
   724 F.3d 458 (3d Cir. 2013) .........................................40, 42

*Hencely v. Fluor Corp.*,
   120 F.4th 412 (4th Cir. 2024) ................................. 3, 17, 30, 35, 37-42

*Hernandez v. Mesa*,
   589 U.S. 93 (2020)......................................................29

*Hetzel v. Cnty. of Prince William*,
   89 F.3d 169 (4th Cir. 1996) ............................................58

*Hinkle v. City of Clarksburg*,
   81 F.3d 416 (4th Cir. 1996) ............................................52

*Holland v. United States*,
   621 F.3d 1366 (Fed. Cir. 2010) ..........................................56

*Huff v. Marine Tank Testing Corp.*,
   631 F.2d 1140 (4th Cir. 1980) ......................................48, 49, 51

*Jesner v. Arab Bank, PLC*,
   584 U.S. 241 (2018)................................... 1, 2, 17, 28-30

vii

*In re KBR, Inc., Burn Pit Litig.*,
    744 F.3d 326 (4th Cir. 2014) .........................................................40, 42

*In re KBR, Inc., Burn Pit Litig.*,
    893 F.3d 241 (4th Cir. 2018) ........................................2, 17, 35, 37

*Kiobel v. Royal Dutch Petroleum Co.*,
    569 U.S. 108 (2013).....................................................................19, 20

*Ladd v. Rsch. Triangle Inst.*,
    335 F. App'x 285 (4th Cir. 2009) .......................................................49

*Lancaster v. Sec'y of the Navy*,
    109 F.4th 283 (4th Cir. 2024) ...................................................... 31-32

*Lane v. Pena*,
    518 U.S. 187 (1996)..........................................................1, 2, 31, 32

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024)...............................................................................36

*Loren Data Corp. v. GXS, Inc.*,
    501 F. App'x 275 (4th Cir. 2012) .......................................................53

*Luna v. United States*,
    454 F.3d 631 (7th Cir. 2006) .............................................................51

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)................................................................................44

*McLamb v. E. I. Du Pont De Nemours & Co.*,
    79 F.2d 966 (4th Cir. 1935) .........................................................49, 51

*McNeill v. Butz*,
    480 F.2d 314 (4th Cir. 1973) ...............................................................54

*Miller v. Field*,
    35 F.3d 1088 (6th Cir. 1994) .............................................................54

*Milwaukee v. Illinois*,
    451 U.S. 304 (1981)...............................................................................41

*Mohamad v. Palestinian Auth.*,
    566 U.S. 449 (2012)............................................................................30

*Morrison v. Nat'l Austrl. Bank Ltd.*,
    561 U.S. 247 (2010)........................................................................20, 24

*Nestlé USA Inc. v. Doe*,
    593 U.S. 628 (2021)....................................1-2, 8, 17, 19, 21-25, 28, 29

*Nestlé USA, Inc. v. Doe I*,
    No. 19-416, 2020 WL 5498509 (Sept. 2020)....................................25

*Nixon v. United States*,
    506 U.S. 224 (1993)............................................................................36

*Payne v. Taslimi*,
    998 F.3d 648 (4th Cir. 2021) .......................................................19, 23

*Philip Morris USA v. Williams*,
    549 U.S. 346 (2007)............................................................................60

*Price v. City of Charlotte, N.C.*,
    93 F.3d 1241 (4th Cir. 1996) .............................................................58

*Projects Mgmt. Co. v. DynCorp Int'l*,
    584 F. App'x 121 (4th Cir. 2014) ......................................................59

*Quintero v. United States*,
    8 F.4th 1095 (9th Cir. 2021) .............................................................32

*RJR Nabisco, Inc. v. European Community*,
    579 U.S. 325 (2016).....................................................................20-24

*Robinson v. U.S. Dep't of Educ.*,
    917 F.3d 799 (4th Cir. 2019) .............................................................33

*Saleh v. Titan Corp.*,
    580 F.3d 1 (D.C. Cir. 2009).........................................3, 30, 35, 39-42

*Sampson v. Fed. Rep. of Germany*,
    250 F.3d 1145 (7th Cir. 2001) ...........................................................32

*Sardis v. Overhead Door Corp.*,
  10 F.4th 268 (4th Cir. 2021) ................................................................ 50, 53-54

*Siderman de Blake v. Argentina*,
  965 F.2d 699 (9th Cir. 1992) ................................................................ 32

*Sines v. Hill*,
  106 F.4th 341 (4th Cir. 2024) ............................................................... 60

*Smith v. Socialist People's Libyan Arab Jamahiriya*,
  101 F.3d 239 (2d Cir. 1997) ................................................................. 32

*Sosa v. Alvarez-Machain*,
  542 U.S. 692 (2004) .............................................................. 1, 27, 29, 40-41

*Sossaman v. Texas*,
  563 U.S. 277 (2011) ............................................................................. 32

*Suarez Corp. Indus. v. McGraw*,
  125 F.3d 222 (4th Cir. 1997) ............................................................... 18

*Sunrise Continuing Care, LLC v. Wright*,
  671 S.E.2d 132 (Va. 2009) .................................................................. 59

*Taylor v. Kellogg Brown & Root Servs., Inc.*,
  658 F.3d 402 (4th Cir. 2011) ............................................................ 35, 37

*Thomas v. Salvation Army S. Territory*,
  841 F.3d 632 (4th Cir. 2016) ............................................................... 53

*Transamerica Ins. Co. v. United States*,
  989 F.2d 1188 (Fed. Cir. 1993) ...................................................... 50, 57

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ............................................................................. 25

*United States v. Dennis*,
  19 F.4th 656 (4th Cir. 2021) ............................................................... 52

*United States v. Elbaz*,
  52 F.4th 593 (4th Cir. 2022) ............................................................... 26

*United States v. Harris*,
   991 F.3d 552 (4th Cir. 2021) ...............................................................25

*United States v. King*,
   395 U.S. 1 (1969)..................................................................................32

*United States v. Manbeck*,
   744 F.2d 360 (4th Cir. 1984) .......................................................... 26-27

*United States v. Mitchell*,
   445 U.S. 535 (1980)..............................................................................32

*United States v. Shaw*,
   309 U.S. 495 (1940)..............................................................................32

*United States v. Testan*,
   424 U.S. 392 (1976)..............................................................................32

*United States v. Thompson*,
   98 U.S. 486 (1878)................................................................................32

*Wachovia Bank, N.A. v. Schmidt*,
   445 F.3d 762 (4th Cir. 2006) ...............................................................56

*Ward v. AutoZoners, LLC*,
   958 F.3d 254 (4th Cir. 2020) ...............................................................59

*Weeks v. Angelone*,
   528 U.S. 225 (2000)..............................................................................49

*WesternGeco LLC v. ION Geophysical Corp.*,
   585 U.S. 407 (2018)..............................................................................24

*Whiteman v. Chesapeake Appalachia, LLC*,
   729 F.3d 381 (4th Cir. 2013) ...............................................................19

*Wikimedia Foundation v. NSA*,
   14 F.4th 276 (4th Cir. 2021) ...........................................................44, 45

*U.S. ex rel. Wilson v. Graham Cty. Soil & Water Cons. Dist.*,
   777 F.3d 691 (4th Cir. 2015) ...............................................................25

*Wu Tien Li-Shou v. United States*,
   777 F.3d 175 (4th Cir. 2015) ...............................................................38

*Yearsley v. W.A. Ross Construction Co.*,
   309 U.S. 18 (1940)................................................................................33, 34

*Yousuf v. Samantar*,
   699 F.3d 763 (4th Cir. 2012) ..............................................................7

*Yousuf v. Samantar*,
   No. 1:04-cv-1360, 2012 WL 3730617 (E.D. Va. Aug. 28, 2012)..........58, 59, 60

*Ziglar v. Abbasi*,
   582 U.S. 120 (2017)...............................................................................28-30

## Statutes

18 U.S.C. § 1349 ......................................................................................25

28 U.S.C. § 1291 ......................................................................................4

28 U.S.C. § 1350 ......................................................................................1, 25

28 U.S.C. § 1350 note ...............................................................................30

28 U.S.C. § 2680 ......................................................................................39

50 U.S.C. § 1431 ......................................................................................34

Pub. L. 107-243, 116 Stat. 1498 ............................................................34

Va. Code Ann. § 8.01-38.1 .......................................................................60

## Other Authorities

48 C.F.R. 7.503 ........................................................................................35, 51

Federal Rule of Evidence 803....................................................................54-55

Federal Rule of Evidence 804....................................................................15, 55

Restatement (Third) of Agency § 7.03 (2006).........................................50

29 *Williston on Contracts* § 73:10 (4th ed.)..............................................57

30B Wright & Miller, *Federal Practice and Procedure* § 6886 (2017) .................54

# I.    INTRODUCTION

This case is brought solely under the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, which creates no federal claims but provides jurisdiction for aliens to bring certain claims for torts violating the law of nations. *Sosa v. Alvarez-Machain*, 542 U.S. 692, 714 (2004). Plaintiffs-Appellees ("Plaintiffs") seek to hold Appellant CACI Premier Technology, Inc. ("CACI") liable, on a co-conspirator liability theory, for torture and cruel, inhuman, or degrading treatment ("CIDT") allegedly committed by U.S. soldiers at Abu Ghraib prison during the war in Iraq.

The preceding two sentences, standing alone, demonstrate the district court's lack of subject-matter jurisdiction. *First*, the ATS does not apply extraterritorially, *Nestlé USA Inc. v. Doe*, 593 U.S. 628, 634 (2021), and all relevant conduct occurred in Iraq. *Second*, because the ATS creates no causes of action, Plaintiffs' claims required the district court to create and define claims under ATS that, in the district court's view, were actionable torts in violation of the law of nations. Judge-made claims are highly disfavored, and there are "sound reasons to think Congress might doubt the efficacy or necessity of a [judge-made] damages remedy" arising from the United States' conduct of war. *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 264 (2018). *Third*, CACI was entitled to derivative sovereign immunity, but was denied that by the district court's unprecedented holding that the United States impliedly waived sovereign immunity. *Lane v. Pena*, 518 U.S. 187, 192 (1996). *Fourth*, wartime military decisions are constitutionally committed to the Executive Branch and present nonjusticiable political questions. *Dorado-Ocasio v. Averill*, ___ F.4th ___, 2025 WL 478406, at *6 (4th Cir. 2025).

1

The district court acknowledged prejudging this case, deciding to reject CACI's legal defenses and force the case to trial if CACI did not settle:

> I think I told you-all when I first got this case, you know, given its tortured history, I said we're going to have lots of motions practice, but you should expect if you don't settle this case, it's going to go to trial. I mean, and that's what's going to happen. It's going to go to trial unless it settles, all right?

JA3854-3855.

Consistent with its settle-or-trial approach, the district court repeatedly disregarded Supreme Court and Fourth Circuit precedent. For example, the district court:

➢ Refused to apply the Supreme-Court-mandated "focus" test for extraterritoriality, *Nestlé*, 593 U.S. at 634, based on its conclusion that "mechanically applying the presumption against extraterritoriality to bar these ATS claims would not advance the purposes of the presumption" against extraterritoriality. JA4384;

➢ Refused to apply recent precedents curtailing judge-made causes of action. JA4396. *See Egbert v. Boule*, 596 U.S. 482, 491 (2022); *Jesner*, 584 U.S. at 264;

➢ Refused to apply precedent holding that sovereign immunity is never impliedly waived, thereby precluding CACI's derivative sovereign immunity defense. JA4005. *See Lane*, 518 U.S. at 192; *Goldstar (Panama) S.A. v. United States*, 967 F.2d 965, 968 (4th Cir. 1992);

➢ Refused to apply *In re KBR, Inc., Burn Pit Litig.*, 893 F.3d 241, 259 (4th Cir. 2018) ("*Burn Pit II*"), which held that suits against military contractors raise nonjusticiable political questions if the military exercised direct control over the contractor, despite the district court's observation that the military's operational control over CACI was "uncontestable." JA3802, JA6463. *See Dorado-Ocasio*, 2025 WL 478406, at *6;

➢ Refused to apply combatant-activities preemption precedents displacing all *non-federal* tort duties, which includes the international-law tort duties on which Plaintiffs' ATS claims rely. JA6463, JA6470-6471. *See Hencely v. Fluor Corp.*, 120 F.4th 412, 430 (4th Cir. 2024); *Saleh v. Titan Corp.*, 580 F.3d 1, 16 (D.C. Cir. 2009); and

➢ Refused to apply precedent requiring dismissal after the United States invoked the state secrets privilege to deny CACI discovery of the identities of Army *and CACI* interrogators interacting with Plaintiffs and records of Plaintiffs' interrogations. JA3802. *See El-Masri v. United States*, 479 F.3d 296, 306 (4th Cir. 2007).

The result was little more than a show trial. CACI was given the impossible task of defending at trial while being denied, on state secrets grounds, the identities of *the CACI interrogators who interacted with Plaintiffs*, the very sources of CACI's alleged vicarious liability. By its end, the trial was so far off the rails that the jury asked, *ex parte*, whether it could award punitive damages to a non-profit to benefit all Abu Ghraib victims. When told it could not, the jury awarded each Plaintiff $3 million compensatory and $11 million in punitive damages, despite no expert diagnosis of emotional injury, lasting physical injuries ranging from limited to non-existent, and no evidence of profits on which legally-cognizable punitive damages could be based.

The Court should direct dismissal for lack of subject-matter jurisdiction, which renders all interlocutory rulings null and void, or alternatively should direct dismissal or judgment for CACI on its myriad other defenses.[1]

---

[1] This litany of errors was presaged by Judge Wilkinson's observation: "I write separately only because the difficulties with these actions are so legion that no single dissent could hope to cover them all." *Al Shimari v. CACI Int'l Inc*, 679 F.3d 205, 226 (4th Cir. 2012) (Wilkinson, J., dissenting) ("*Al Shimari II*").

## II.    JURISDICTION

CACI appeals the January 10, 2025 amended final judgment, and interlocutory orders merged into the amended final judgment. JA6479. CACI noticed its appeal on January 10, 2025. JA6480.

### A.    Appellate Jurisdiction

This Court has jurisdiction under 28 U.S.C. § 1291.

### B.    District Court Jurisdiction

The district court lacked subject-matter jurisdiction because: (1) the ATS does not apply extraterritorially; (2) the district court lacked power to create Plaintiffs' claims; (3) CACI is immune from suit; and (4) Plaintiffs' claims implicate political questions.

## III.   ISSUES PRESENTED

1.     Whether the district court erred in applying the ATS extraterritorially.

2.     Whether the district court erred in creating Plaintiffs' causes of action under the ATS.

3.     Whether the district court erred in denying CACI derivative sovereign immunity.

4.     Whether the district court erred in refusing to dismiss on political question grounds.

5.     Whether the district court erred in holding that Plaintiffs' claims were not preempted.

6.     Whether the district court erred in refusing to dismiss on state secrets grounds.

7.     Whether the district court erred in declining to enter judgment for CACI on borrowed servant grounds.

8.     Whether the district court erred in denying CACI judgment on Plaintiffs' conspiracy claims.

9.     Whether the district court erred in granting the United States summary judgment on CACI's third-party claims.

10.    Whether the district court erred in not granting a remittitur or new trial on damages.

## IV.   STATEMENT OF THE CASE

### A.   Procedural History

Plaintiffs filed suit in 2008, asserting ATS and common-law claims.  The district court (Hon. Gerald Bruce Lee) dismissed Plaintiffs' ATS claims but not their common-law claims.  JA299.  CACI appealed.  A panel of this Court held that federal law preempted Plaintiffs' common-law claims.  *Al Shimari v. CACI Int'l, Inc*, 658 F.3d 413 (4th Cir. 2011) ("*Al Shimari I*").  On rehearing *en banc*, however, this Court held it lacked appellate jurisdiction.  *Al Shimari II*, 679 F.3d at 205.

The district court subsequently reinstated Plaintiffs' ATS claims, JA372, but dismissed them in 2013 as extraterritorial.  JA401.  This Court reversed, but directed consideration of justiciability "before proceeding further in the case."  *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 533-34 (4th Cir. 2014) ("*Al Shimari III*").  The district court dismissed on political question grounds, but this Court remanded for further consideration.  *Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 160 (4th Cir. 2016) ("*Al Shimari IV*").

Judge Lee immediately recused himself, without explanation; the case was reassigned to Hon. Leonie M. Brinkema.  Plaintiffs dismissed their common-law claims with prejudice, proceeding only under the ATS.  JA433.  Plaintiffs next abandoned direct abuse allegations.  JA489 ("We are not contending that the CACI interrogators laid a hand on the plaintiffs.").  Accordingly, the district court dismissed Plaintiffs' direct abuse claims, leaving only conspiracy and aiding-and-abetting claims under the ATS.  JA618.

6

Given Plaintiffs' revised theory of abuse by soldiers only, CACI impleaded the United States and John Does 1-60 (soldiers who abused Plaintiffs).  JA549.  The district court upheld, on state secrets grounds, the United States' withholding of the identities and backgrounds of interrogators and interpreters participating in Plaintiffs' interrogations.  JA682-689, JA771, JA865, JA911-918, JA931, JA979.  CACI was only permitted pseudonymous, telephonic depositions of these witnesses.  *See, e.g.*, JA855-858, JA946-949.

The United States, with district court approval, again invoked the state secrets privilege to withhold, among other things, "the tailored interrogation plan actually used for a lengthy interrogation of Al Shimari," a plan that "provides a focused assessment of the approach best suited to assist the interrogators in obtaining his cooperation," and, for Al Shimari and Al-Zuba'e, reports "summariz[ing] the results of interrogations [that] were completed close in time to their conclusion."  JA1065-1067, JA1377-1378.

After discovery, the district court refused to dismiss on extraterritoriality, political question, and state secrets grounds, and denied CACI summary judgment except as to Plaintiff Rashid, making this a three-Plaintiff case.  JA3802.  The district court also rejected the United States' sovereign immunity invocation, finding an implied waiver of immunity for allegations of *jus cogens* violations.[2]

---

[2] A *jus cogens* norm is "recognized by the international community of States as a whole as a norm from which no derogation is permitted."  *Yousuf v. Samantar*, 699 F.3d 763, 775 (4th Cir. 2012).  "[A]s a matter of international and domestic law, *jus cogens* violations are . . . acts that are not officially authorized by the Sovereign."  *Id.* at 776.

JA4001, JA4013.    Nevertheless, the district court granted the United States summary judgment on CACI's third-party claims, holding that CACI's close-out agreement with the *Interior Department* released future claims against any federal agency relating to CACI's provision of interrogators.  JA4011.  The district court then held that the United States' sovereign immunity waiver precluded CACI's derivative sovereign immunity defense.  JA4005.

CACI appealed the denial of any chance to pursue derivative sovereign immunity, but this Court concluded it lacked appellate jurisdiction.  *Al Shimari v. CACI Premier Tech., Inc.*, 775 F. App'x 758 (4th Cir. 2019) ("*Al Shimari V*").  The Supreme Court denied CACI's U.S.-supported *certiorari* petition addressing appellate jurisdiction.  *CACI Premier Tech., Inc. v. Al Shimari*, 141 S. Ct. 2850 (2021).

In July 2021, CACI renewed its extraterritoriality motion, relying on *Nestlé*, 593 U.S. at 634.  The district court took CACI's motion under advisement for two years before denying it.  JA4364-4365.  The district court held that it could ignore the focus test if the result was contrary to its perception of the purposes of the presumption against extraterritoriality.  JA4383-4384.  The district court also rejected CACI's argument that it lacked power to create Plaintiffs' claims. JA4396.

The district court issued pretrial orders barring CACI, on relevance grounds, from introducing "the reasons for Plaintiffs' detention or inability to travel," any association with anti-Coalition or terrorist activity, or that Plaintiffs lied during interrogations.    JA4014, JA4426, JA4430-4431.    This prohibited CACI from

presenting bias evidence that reflected negatively on Plaintiffs' character, including that Al Shimari was a Ba'ath Party member captured with an arsenal of automatic weapons, improvised explosive devices, and gunpowder, and that Al-Zuba'e was sufficiently steeped in insurgent matters to divulge rumors of a planned attack and the insurgents possibly involved. JA8850-8857, Dist. Ct. Dkt. #369-1 at Exs. 20, 22-23; JA1069. CACI was even prohibited from asking Al-Ejaili if the Army wrongfully detained him. JA6730. Conversely, the district court ruled that *Plaintiffs* could "humanize" themselves at trial by providing *positive* background information. JA4553-4556.

The district court ruled Plaintiffs could present negative character evidence about individual CACI employees, including minor transgressions not involving Plaintiffs. Plaintiffs were allowed to present evidence that a CACI interrogator, with no connection to Plaintiffs, drank alcohol once and resisted critiques of his report-writing. JA5995, JA6833-6834, JA6843-6844, JA7976. Plaintiffs had a military investigator testify that he thought a CACI interrogator "stared him down" and was untruthful. JA4642, JA5740, JA6953-6956.

The district court also denied CACI's motion to preclude evidence of CACI interrogators' general training and experience. JA4837, JA5740. Accordingly, Plaintiffs sullied CACI on the grounds that *some* interrogators lacked formal training,[3] while the state secrets privilege barred CACI from presenting the training

---

[3] CACI hired those employees as screeners, but the Army requested they be promoted to interrogators to address staggering interrogator shortfalls. JA7265-7267, JA7461-7463.

and experience of CACI employees who *actually* interacted with Plaintiffs. JA6652, JA6762-6763, JA6833, JA7656-7657, JA7835, JA7896.

The first trial ended with a hung jury. JA4565. At the second trial, the district court granted CACI judgment on Plaintiffs' aiding-and-abetting claims. JA7621. There was no evidence to support those claims. While CACI asserted that the conspiracy claims were equally infirm, the district court allowed them to proceed.

During deliberations, the district court instructed that, for CACI's borrowed servant defense, the jury should decide whether the "Army alone or both the Army and CACI had [the] power to control" CACI interrogators. JA7763. It left the jury uninstructed on what to do if the Army dominated control but CACI had some *limited* ability to direct its employees. The district court also met with the jury *ex parte*, with the parties' consent provided any important question would be contemporaneously disclosed. The jury asked if it could award punitive damages to a non-profit to benefit all Abu Ghraib victims; the district court, without disclosure to the parties, told the jury that was not allowed. JA7775.

The jury found for Plaintiffs on their surviving conspiracy counts, awarding each $3 million in compensatory and $11 million in punitive damages. JA6399-6400. The district court denied CACI's motion for judgment without opinion and entered an amended judgment allowing post-judgment interest. JA6479. CACI appealed. JA6480.

**B.      Statement of Facts**

**1.      Direction and Control of CACI Interrogators**

In 2003, the U.S. military established a Joint Interrogation and Debriefing Center ("JIDC") at Abu Ghraib prison commanded by a military intelligence brigade.  Abu Ghraib prison was "located within an active war zone," and regularly "subject to enemy mortar fire, rocket-propelled grenades, and sniper fire."  JA632.[4]

CACI received two Government Delivery Orders ("DO-35" and "DO-71") for civilian interrogators to augment Army interrogators in Iraq.  DO-35 provided that CACI interrogators would perform interrogations in accordance with "local SOP and higher authority regulations," conduct other intelligence activities "as directed," and "report findings of interrogation IAW with local reference documents, SOPs, and higher authority regulations as required/directed."  JA8523.  DO-71 required that CACI interrogators perform under the direction and control of the unit's [military intelligence] chain of command or Brigade S2, as determined by the supported command."  JA8567.  The Army approved all persons hired by CACI to deploy to Iraq as interrogators.  JA7287, JA7376-7377.

Upon arrival at Abu Ghraib, CACI and Army personnel were advised that there were two chains of command, operational and administrative.  "The interrogation section leader will be the first person in the operational chain of command, proceeding to the NCOIC and OIC.  Administrative actions will be

---

[4] *See also* JA5922 (Frederick); JA6127 (Stefanowicz); JA6864, JA6898 (Nelson); JA6968-6969 (Taguba); JA7248-7249, JA7284 (Porvaznik); JA7453 (Mudd); JA9214-9215 (CACI Interrogator A).

resolved either by the civilian contractor site manager or the HHSC 1SG/commander." JA7250, JA8166. JIDC organizational charts reflect the operational chain of command, with CACI interrogators integrated with soldiers into "Tiger Teams" that reported to their military section leader, to the Interrogation Control Element ("ICE") military leadership, and then to Colonel Pappas, Commander of the 205th Military Intelligence Brigade. JA635, JA8588, JA9673-9674. Through an interrogatory response admitted at trial, the United States acknowledged that CACI interrogators "were subject to the direction of the military chain of command," and "no CACI personnel were in this chain of command." JA8501-8502, JA8508-8509.

Colonel Pappas summarized the military's total control:

> The military decided where each detainee would be incarcerated within Abu Ghraib prison, which detainees would be interrogated, and who would conduct the interrogations of a given detainee. Both military and CACI PT interrogators were required to prepare an interrogation plan for a detainee, which was reviewed and approved by the U.S. military leadership in the [ICE]. At the conclusion of an interrogation, military and civilian interrogators were required to prepare an interrogation report and enter it into a classified military database. The military then decided what use to make of information obtained during interrogations.

JA633; *see also* JA6229-6232. Major Holmes,[5] OIC of the ICE, testified that the military dictated, for Army *and CACI* interrogators, how all interrogations were conducted. The military "didn't differentiate between the civilian[s] and the

---

[5] Major Holmes was previously known as Captain Carolyn Wood.

soldiers" and "treated the CACI personnel the same" as military intelligence. JA6249-6256. Many witnesses testified similarly.[6] The Army also established the Interrogation Rules of Engagement ("IROEs") for CACI and Army interrogators, which listed interrogation approaches approved for general use and approaches requiring additional approval. JA6880-6881, JA7262-7263, JA8013.

During jury deliberations in the second trial, the district court described the "pretty much uncontestable evidence" regarding operational control:

> [The Army] put the Tiger Teams and these teams together. There was a military chain of command. And the work that was being done was interrogation work. And all of that falls under the military's end of things. And what CACI was doing was doing classic government contracting, that is they were providing the government with people to perform a function which the government wanted help with.

JA7753.

CACI's U.S.-based personnel were *completely* removed from operational matters, providing administrative support only: "time cards, pay raises, performance appraisals, travel arrangements, those types of things." JA7361 (Billings); *see also* JA7140-7141 (Monahan). CACI's U.S.-based personnel did not develop or approve IROEs, were not advised of intelligence priorities, were not told which detainees the U.S. Army selected for interrogation, could not access

---

[6] *See also* JA6037-6040 (CACI Interrogator A); JA6113-6118 (CACI Interrogator G); JA6136-6138 (Stefanowicz); JA6873, JA6880-6881, JA6883 (Nelson); JA7158-7159, JA7162-7163 (Brady); JA7344-7346, JA7350-7352 (Billings); JA7459, JA7469, JA7472-7473 (Mudd).

interrogation plans or reports, and were not even allowed to know who CACI interrogators interrogated. JA6042 (CACI Interrogator A); JA6116-6117 (CACI Interrogator G); JA6139-6140 (Stefanowicz); JA6877-6880, JA6883 (Nelson); JA7356-7361 (Billings).

### 2. Plaintiffs' Treatment Was a Disputed Issue at Trial

Al-Ejaili testified live at trial that he was a family man and reporter swept up by U.S. soldiers and brought to Abu Ghraib. JA6679-6682. He testified that he was interrogated more than twenty times during his fifty days at Abu Ghraib. JA6712, JA6729. He alleged abuse by soldiers before ever being interrogated and simple assaults during interrogations. JA6683-6702. The United States, however, has no record of Al-Ejaili ever being subjected to an intelligence interrogation, and the report Al-Ejaili wrote upon his release alleged no civilian involvement in his mistreatment. JA8441-8446, JA8509-8510. Al-Ejaili admitted having no lasting physical injuries. JA6734.

Banned from the United States, Al Zuba'e testified through live video from Iraq that he was a family man, storekeeper, and former taxi driver. JA6778-6779. He alleged sexual humiliation by unidentified civilians during intake, being forced by soldiers to crawl on his stomach, stress positions, use of dogs, and simple assaults in connection with interrogations. JA6779-6805. Al Zuba'e submitted an administrative claim that he, a cab driver, had $20,000 in cash seized by U.S. soldiers upon his arrest. JA6818, JA8599. What an Iraqi cab driver was doing with $20,000 in cash might have been explained but for substantial redactions of his detainee file on state secrets grounds. JA1066-1067, JA9797. Like Al-Ejaili,

Al Zuba'e made a contemporaneous statement alleging abuse; that statement did not allege abuse during in-processing or by civilians.  JA7810.  Army and CACI interrogators assigned to Al Zuba'e denied seeing any abuses like those alleged by Al Zuba'e.  JA6058-6062, JA6079-6082, JA6089-6093, JA6103-6112.  Because of the state secrets privilege, these key fact witnesses testified by pseudonymous, tape-recorded audio depositions, and were prohibited from describing their interrogation training or experience.   JA855-858; JA6098-6099, JA9206-9208, JA9210-9217, JA10069-10074.  CACI also was denied, on state secrets grounds, contemporaneous Army records of Al-Zuba'e's interrogations.  JA1066-1067.

Banned from the United States, Al Shimari was to testify by live video from Iraq, but he allegedly was arrested by Iraqi police en route to testify.  Without first-hand evidence about his absence, or that he was not at fault for it, CACI objected to reading Al Shimari's April trial testimony to the jury, but the district court permitted it without making any findings under Federal Rule of Evidence 804.  JA7180.  Al Shimari described himself as a family man, teacher, and school administrator.  JA7187-7189.  He testified, without corroboration or connection to CACI personnel, to assaults, stress positions, sexual assault and humiliation, electric shock, interaction with dogs, forced shaving and showers, and forced kneeling on rocks during and in connection with multiple interrogations.  JA7189-7199.  But U.S. records indicate only one interrogation of Al Shimari, JA8497-8499, and the participating Army and CACI interrogators denied ever seeing a detainee subjected to the abuses Al Shimari alleged.  JA6045-6049, JA6058-6062.  Al Shimari's interrogators testified via tape-recorded pseudonymous depositions

and were not permitted to "humanize" themselves with testimony about their background, training, or experience. JA855-858, JA1639-1647, JA1849-1853. CACI also was denied, on state secrets grounds, records from Al Shimari's interrogation. JA1065.

## V. SUMMARY OF ARGUMENT

The Third Amended Complaint ("TAC") asserted twenty counts over fifty-five pages and 314 paragraphs. JA222. By the end of trial, just two counts remained. Plaintiffs' common-law claims, hopelessly time-barred and preempted, were dismissed with prejudice in 2017. The district court dismissed Plaintiffs' direct abuse claims after Plaintiffs conceded that no CACI employee laid a hand on them. Plaintiffs' abandoned their war crimes claims, at the district court's suggestion, during the first trial. The district court entered judgment for CACI on Plaintiffs' aiding-and-abetting claims in the second trial. All that remained were two ATS claims seeking to hold CACI liable, on a co-conspirator theory, for torture and CIDT allegedly committed by U.S. soldiers. *See* § IV.A, *supra*.

The TAC alleged sadistic and psychopathic behavior: beatings, rape, sexual assault, death threats, choking, being kept in a cage, oxygen deprivation, food and water deprivation, being shot, hung from the ceiling, and more. JA230-233. Like most of Plaintiffs' claims, these allegations failed for lack of proof, and no evidence that CACI personnel participated, directly or indirectly, in such behavior.

The remaining claims alleged sleep deprivation, stress positions, threats with dogs, solitary confinement, and environmental manipulation, techniques authorized

16

by the IROEs developed, issued, and regulated by the Army. JA229. Whether any of these techniques – which the district court allowed Plaintiffs to offer expert testimony were torture and/or CIDT – were employed on any Plaintiff is unknowable because of the state secrets privilege.

Regardless, the district court lacked subject-matter jurisdiction over the two surviving claims because they are impermissibly extraterritorial. The focus test, which the district court refused to apply, requires dismissal because all conduct relevant to ATS's focus occurred in Iraq. *Nestlé*, 593 U.S. at 634. The district court also lacked authority to create Plaintiffs' judge-made causes of action. *Jesner*, 584 U.S. at 264. The district court's rulings placed itself and Plaintiffs in the position of passing on the propriety of the Army's wartime interrogation operations and interrogation techniques. This the political question doctrine does not allow, as battlefield tactics are the exclusive province of the Executive Branch. *Burn Pit II*, 893 F.3d at 259. Equally fatal, claims based on non-federal tort duties, including Plaintiffs' claims under ATS, are preempted where, as here, contractor personnel are integrated into combatant activities over which the military retains command authority. *Hencely*, 120 F.4th at 426.

The trial evidence established that the Army, not CACI, exercised operational control over CACI interrogators. This uncontestable fact, JA7753, precludes Plaintiffs' claims on derivative sovereign immunity and borrowed servant grounds. *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 646 (4th Cir. 2018) (derivative sovereign immunity); *Estate of Alvarez v. Rockefeller Found.*, 96 F.4th 686, 694 (4th Cir. 2024) (borrowed servant). The

district court's erroneous denial of derivative sovereign immunity also featured a first-of-its-kind, Supreme-Court-defying holding that the United States impliedly waived sovereign immunity for allegations of *jus cogens* violations.

The state secrets privilege denied CACI the identities and backgrounds of interrogators interacting with Plaintiffs, as well as records from Plaintiffs' interrogations. This included denying CACI discovery of the identities of the CACI employees interrogating Plaintiffs, the source of CACI's supposed vicarious liability. CACI could not discover this crucial evidence or effectively present at trial the inadequate discovery allowed. The district court should have dismissed this case as a result. *El-Masri*, 479 F.3d at 306.

The district court also erred in denying CACI judgment on Plaintiffs' conspiracy claims, in granting the United States summary judgment on CACI's third-party claims, and in rejecting CACI's motion for a new trial on damages.

## VI.  ARGUMENT

### A.    Standard of Review

The district court's subject-matter jurisdiction rulings – extraterritoriality, propriety of judge-made claims, derivative sovereign immunity, and political question – are reviewed *de novo*. *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 226 (4th Cir. 1997). Plaintiffs bear the burden of proving jurisdiction. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006). The district court's denial of CACI's motion for judgment, its refusal to dismiss on state secrets grounds, and its entry of judgment on the jury's damages award and on CACI's

18

third-party claims are reviewed *de novo*. *Burgess v. Goldstein*, 997 F.3d 541, 549 (4th Cir. 2021) (judgment as matter of law); *El-Masri*, 479 F.3d at 302 (state secrets); *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 304 (4th Cir. 1998) (excessive damages); *Whiteman v. Chesapeake Appalachia, LLC*, 729 F.3d 381, 385 (4th Cir. 2013) (summary judgment).

### B.    The District Court Lacked Subject-Matter Jurisdiction

### 1.    Plaintiffs' Claims Are Impermissibly Extraterritorial

ATS has no extraterritorial application, *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013), and the "focus test" determines whether a claim brought under ATS is extraterritorial. *Nestlé*, 593 U.S. at 634. Under the focus test, a claim is permissible only if the *conduct* relevant to the statute's focus occurred in the United States. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 425 (2023).

The district court refused to apply the focus test. It initially invoked *Al Shimari III* and law of the case to justify its refusal. JA3807. After *Nestlé*, the district court abandoned law of the case and claimed a right to disregard the focus test when the results did not, in its view, serve the purposes of the presumption against extraterritoriality. This approach is erroneous. A district court cannot disregard Supreme Court precedent; it must apply the holding *and the reasoning* of higher-court precedents. *City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265, 271 (4th Cir. 2025); *Payne v. Taslimi*, 998 F.3d 648, 654-55 (4th Cir. 2021). Dismissal is required.

### a. The District Court Erred in Refusing to Apply the Focus Test

As the first appellate court to apply *Kiobel*, this Court noted it lacked practical guidance and concluded that the focus test, applicable to other statutes,[7] did not apply to the ATS. Relying on cryptic "touch and concern" language in *Kiobel*, this Court concluded that "courts must consider all the facts that give rise to ATS claims, including the parties' identities and their relationship to the causes of action." *Al Shimari III*, 758 F.3d at 527.

On a limited record, the Court allowed Plaintiffs' claims to proceed based on: (1) CACI and its employees' U.S. citizenship; (2) CACI employees' U.S.-issued security clearances; (3) CACI's provision of interrogators under a government contract; and (4) the Court's sense that the TVPA and Anti-Torture Act, while inapplicable, reflected Congress's desire to provide a forum for aliens to sue for acts of torture. *Id.* at 530-31. The Court acknowledged that the proper test for the ATS "may be explained in greater detail in future Supreme Court decisions." *Id.* at 529. That was prescient, as the Supreme Court did just that.

Two years later, in *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 335 (2016), the Supreme Court confirmed the focus test's applicability to ATS, explaining that it "did not need to determine" the ATS's focus in *Kiobel* because "all the relevant conduct regarding those violations 'took place outside the United States.'" *Id.* at 337 (quoting *Kiobel*, 569 U.S. at 124).

---

[7] *See EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 255 (1991) (Title VII); *Morrison v. Nat'l Austrl. Bank Ltd.*, 561 U.S. 247, 266-67 (2010) (Securities Exchange Act).

In addressing CACI's post-discovery extraterritoriality motion, the district court acknowledged *RJR Nabisco* but stated that *Al Shimari III* was law of the case and it was "not reversing the Fourth Circuit," although "[t]hey may want to reverse themselves." JA3807. This conclusion drew a comment from a member of this Court in *Al Shimari V* before its dismissal on appellate jurisdiction grounds:

> Somewhere in the record, Judge Brinkema said that it's – used the phrase "law of the case." Does – does she understand that *RJR Nabisco* controls?

JA4158 (Floyd, J.).

The Supreme Court then decided *Nestlé*, 593 U.S. at 633, an ATS case alleging the defendants aided and abetted forced child labor in the Ivory Coast. The plaintiffs alleged the following domestic contacts:

> ➢ "Every major operational decision regarding Nestlé's United States market is made or approved in the United States";
>
> ➢ Cargill's "decisions about buying and selling commodities are made at its Minneapolis headquarters";
>
> ➢ "Defendants depended on – and orchestrated – a slave-based supply chain";
>
> ➢ "[D]efendants continued to provide financial support and technical farming aid, even though they knew their acts would assist farmers who were using forced child labor, and knew their assistance would facilitate child slavery"; and
>
> ➢ "Defendants' U.S.-based employees regularly inspect[ed] operations in the Ivory Coast and report[ed] back to the United States offices, where these financing decisions, or 'financing arrangements,' originated."

*Doe v. Nestlé, S.A.*, 906 F.3d 1120, 1123, 1126 (9th Cir. 2018) ("*Doe II*").

The Supreme Court reaffirmed that an ATS plaintiff "must establish that the conduct relevant to the statute's focus occurred in the United States." *Nestlé*, 593 U.S. at 633. The Court did not need to determine ATS's focus because the domestic conduct on which the plaintiffs relied constituted "general corporate activity – like decisionmaking – [which] cannot alone establish domestic application of the ATS." *Id.* at 634. "Because making 'operational decisions' is an activity common to most corporations, generic allegations of this sort do not draw a sufficient connection between the cause of action respondents seek – aiding and abetting forced labor overseas – and domestic conduct." *Id.*

In *Abitron*, the Court further refined the focus test, emphasizing it turns on the place of the *conduct* relevant to a statute's focus, not the "focus" itself, which "can be 'conduct,' 'parties,' or 'interests' that Congress sought to protect or regulate." 600 U.S. at 425. The Court explained that basing extraterritoriality on the parties' identities or statuses, or on interests being protected, rather than on relevant *conduct*, would allow claims resting on foreign conduct "to be repackaged as a 'domestic application'" of a domestic statute. *Id.* Repackaging is precisely what the district court did, contrary to *RJR Nabisco*, *Nestlé*, and *Abitron*.

In denying CACI's post-*Nestlé* extraterritoriality motion, the district court acknowledged "the Supreme Court's conduct-centered approach reflected in its 'focus' analysis." JA4383-4384. Nevertheless, the district court invoked a *dissenting* opinion from *Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 209-11 (5th Cir. 2017) (Graves, J., dissenting), decided before *Nestlé* and *Abitron*, to hold that it could decide extraterritoriality based on the parties' identities and

22

statuses, and "the domestic and foreign interests of the United States," instead of conduct relevant to the ATS's focus. JA4383-4384.

The district court justified disregarding the focus test, asserting that "mechanically applying the presumption against extraterritoriality to bar these ATS claims would not advance the purposes of the presumption." JA4384 (internal quotations omitted). Through this tortured analysis, the district court concluded that, "even after *Nestlé*," it could decide extraterritoriality based on the non-conduct considerations invoked in *Al Shimari III* but expressly rejected by the Supreme Court in *Nestlé* and *Abitron*. JA4383-4384.

Lower courts cannot reject Supreme Court precedents with which they disagree. *Payne*, 998 F.3d at 655 n.4. *RJR Nabisco*, *Nestlé*, and *Abitron* admit of no exceptions to their command that courts apply the focus test and exclude from consideration domestic connections that are not conduct or which involve general corporate activity. In overtly refusing to apply binding precedent, the district court erred.

### b.     The Focus Test Requires Dismissal

In *Nestlé*, the Supreme Court did not specify ATS's focus, as the only domestic conduct alleged was general corporate activity. This Court could take the same approach. When non-conduct facts are excluded as required by *Abitron*, the only domestic conduct remaining is general corporate activity that, under *Nestlé*, cannot create subject-matter jurisdiction.

The trial record established that CACI personnel *in the United States* had no role in Abu Ghraib operations. They did not set intelligence priorities, establish

23

IROEs, review interrogation plans, select detainees for interrogation, know who the Army assigned CACI employees to interrogate, or participate in deciding how the military would use intelligence obtained during interrogations. JA633, JA6038-6040, JA6115-6117, JA6137-6138, JA6877-6880, JA6883, JA7356-7361. The administrative support provided by U.S.-based CACI personnel involved general corporate activities such as "time cards, pay raises, performance appraisals, travel arrangements, those types of things." JA6042, JA6116-6117, JA6877-6880, JA6883, JA7140-7141, JA7361.

One CACI executive traveled to Iraq to check on employee welfare, but he lacked any authority or ability to guide operational matters. JA7459, JA7471. CACI's domestic personnel did not hear allegations associating a few CACI employees with detainee abuse until spring 2004, long after the alleged abuse, having been assured by Army officials that CACI personnel had been cleared. JA7474. The domestic conduct here pales compared to the general corporate activity held inadequate in *Nestlé*, which included financing cocoa operations knowing that the farmers were using forced child labor. *Nestlé*, 593 U.S. at 631-32; *Doe II*, 906 F.3d at 1123, 1126. As in *Nestlé*, the absence of subject-matter jurisdiction can be determined in this case without specifying ATS's focus.

That said, the focus test confirms that Plaintiffs' claims are extraterritorial. The Supreme Court has always identified a statute's "focus" as something explicitly mentioned in the statute's text.[8] "[A] statute's 'focus' is 'the object of its

---

[8] *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 414 (2018); *RJR Nabisco*, 579 U.S. at 337; *Morrison*, 561 U.S. at 266-67; *EEOC v. Arabian*

(Continued …)

24

solicitude,' including the conduct it seeks to regulate and the parties and interests it seeks to protect." *United States v. Harris*, 991 F.3d 552, 559 (4th Cir. 2021) (quoting *WesternGeco*, 585 U.S. at 414). The ATS protects "aliens" from a "tort only, committed in violation of the law of nations or of a treaty of the United States." 28 U.S.C. § 1350. The torts alleged are torture and CIDT occurring exclusively in Iraq.

That Plaintiffs pursued CACI on a co-conspirator theory does not change the analysis. Conspiracy is not a tort; torture and CIDT are. Conspiracy is "not an independent cause of action, but only the mechanism for subjecting co-conspirators to liability when one of their members committed a tortious act." *Beck v. Prupis*, 529 U.S. 494, 503 (2000); *see Twitter, Inc. v. Taamneh*, 598 U.S. 471, 494 (2023) ("'Enterprises' or 'conspiracies' alone are therefore not tortious – the focus must remain on the tort itself."); *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 769 (4th Cir. 2023).

This was the United States' position in *Nestlé*, where it asserted that the ATS's focus is the tort, not conduct giving rise to a defendant's secondary liability. Brief of the United States as *Amicus Curiae* at 28, *Nestlé USA, Inc. v. Doe I*, No. 19-416, 2020 WL 5498509 (Sept. 2020). This Court adopted the same approach for the federal conspiracy statute, 18 U.S.C. § 1349. In a case involving conspiracy to commit wire fraud, this Court held that the conspiracy statute's focus

---

*Am. Oil Co.*, 499 U.S. 244, 248 (1991); *see also U.S. ex rel. Wilson v. Graham Cty. Soil & Water Cons. Dist.*, 777 F.3d 691, 698 n.4 (4th Cir. 2015).

was the underlying "*offense* that the conspirators conspire to commit," which occurred domestically, and not the defendant's conspiratorial conduct, which occurred abroad. *United States v. Elbaz*, 52 F.4th 593, 604 (4th Cir. 2022). The focus test demonstrates that ATS's focus is the underlying torts and the alleged conduct relevant to those torts occurred in Iraq.

But even if the place of conspiratorial conduct were relevant to the focus-test analysis, there is no evidence of domestic conspiratorial conduct by CACI personnel. Plaintiffs never identified any CACI employees in the United States who supposedly joined the conspiracy on which the judgment rests, when they joined the supposed conspiracy, or why. *See* Section VI.F, *infra*. Nor did any military personnel testify about domestic conspiratorial conduct by CACI or any detainee-related communication with a U.S.-based CACI employee. As the district court noted, "the only three CACI people who've been identified as having been *possibly complicit* in the conspiracy" were interrogators working in Iraq. JA4571-4572 (emphasis added).

The only connection between CACI's *domestic* personnel and detainee abuse is an email a U.S.-based CACI employee received, but did not investigate, in which a former employee vaguely referenced junior enlisted soldiers violating the IROEs with one unnamed detainee. JA8158-8159. There is no connection between the email and Plaintiffs' treatment and the email exonerated all CACI personnel. A CACI employee's review of this email, with no overt or tacit agreement with anyone to do anything, is not conspiratorial conduct. *United States*

26

*v. Manbeck*, 744 F.2d 360, 390 (4th Cir. 1984) ("[M]ere knowledge . . . is not enough to constitute one part of a conspiracy.").

Plaintiffs conceded the lack of domestic conspiratorial conduct by invoking *respondeat superior* to hold CACI "liable for the conduct of its interrogators" in Iraq. JA7719-7721. Indeed, the only theory of conspiracy on which the district court instructed was Plaintiffs' contention that three CACI interrogators in Iraq "conspired with Army military personnel to inflict torture or [CIDT]." JA7718-7719. Thus, even if conspiratorial conduct were relevant to ATS's focus, "[b]ecause [CACI's] putative agents did not commit any relevant conduct within the United States . . . [CACI] cannot be vicariously liable for that conduct under the ATS." *Balintulo v. Daimler AG*, 727 F.3d 174, 192 (2d Cir. 2013).

## 2. The District Court Erred in Creating Plaintiffs' Private Damages Actions

Congress has not enacted statutory claims for Plaintiffs to pursue under ATS's jurisdictional grant. Accordingly, their claims are dependent on the district court creating and defining claims based on its conception of the law of nations. *Sosa*, 542 U.S. at 720. Judge-made causes of action are highly disfavored:

> [C]reating a cause of action is a legislative endeavor. Courts engaged in that unenviable task must evaluate a range of policy considerations . . . at least as broad as the range . . . a legislature would consider. . . . Congress is far more competent than the Judiciary to weigh such policy considerations. And the Judiciary's authority to do so at all is, at best, uncertain.

*Egbert*, 596 U.S. at 491; *see also Bulger v. Hurwitz*, 62 F.4th 127, 136 (4th Cir. 2023).

27

In *Nestlé*, a three-Justice plurality concluded that federal courts lack power to create ATS claims other than those contemplated when Congress enacted the statute: violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Nestlé*, 593 U.S. at 635 (plurality opinion). It is difficult to conceive of another ATS claim that would meet the Supreme Court's exacting standard for judge-made claims. Alternatively, even if district courts retain some limited power to create new claims under the ATS, that power does not extend to claims arising from the United States' conduct of war and where the Executive has created an alternative remedial scheme.

The district court offered two reasons why it could imply damages remedies in this case: (1) "law of the case"; and (2) its view that recent decisions in *Bivens* cases are inapplicable. JA4396-4397, JA4404. Both are incorrect.

Law of the case is inapplicable when "controlling authority has since made a contrary decision of law applicable to the issue." *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515 (4th Cir. 2003). Law of the case is particularly limited "in the context of motions to reconsider issues going to the court's Article III subject matter jurisdiction." *Id.* Regardless, none of this Court's decisions in this case addressed district courts' power to create and define causes of action.

The district court's attempt to distinguish recent precedents as "*Bivens* only" also fails. The test for creating *Bivens* and ATS claims is *identical*. *Compare Ziglar v. Abbasi*, 582 U.S. 120, 137 (2017) (*Bivens*) *with Jesner*, 584 U.S. at 264 (ATS). The Supreme Court treats *Bivens* and ATS decisions interchangeably. In *Jesner*, an ATS case, the Court relied on three *Bivens* cases in explaining that

28

judge-created claims are disfavored.[9]  In *Hernandez v. Mesa*, 589 U.S. 93 (2020), a *Bivens* case, the Court relied on *Jesner* in explaining that (1) caution is required before implying damages actions "[i]n both statutory and constitutional cases," and (2) "[t]he political branches, not the Judiciary, have the responsibility and institutional capacity to weigh foreign-policy concerns." *Id.* at 101, 103-04, 109.

One year later, the *Nestlé* plurality opinion cited *Hernandez* to explain that "our precedents since *Sosa* have clarified that courts must refrain from creating a cause of action whenever there is even a single sound reason to defer to Congress." *Nestlé*, 593 U.S. at 635 (citing *Hernandez*, 589 U.S. at 102).  And *Egbert*, a *Bivens* case, completed the circle, with the Court quoting the *Nestlé* plurality to hold that "'even a single sound reason to defer to Congress' is enough to require a court to refrain from creating such a remedy." *Egbert*, 596 U.S. at 491 (quoting *Nestlé*, 593 U.S. at 635).  This Court similarly treats ATS and *Bivens* claims interchangeably, quoting the *Nestlé* plurality in applying the test for judge-made *Bivens* claims. *Dyer v. Smith*, 56 F.4th 271, 281 (4th Cir. 2022).

Plaintiffs' judge-made claims do not pass muster.  In *Egbert*, the Court rejected a *Bivens* claim that a border patrol agent assaulted an American smuggling suspect, in the United States, because of its nexus to national security.  596 U.S. at 494-96.  In *Dyer*, this Court held that a dispute over photographing a TSA pat-down was too connected to national security to allow an implied claim.  56 F.4th at

---

[9] *Jesner*, 584 U.S. at 264 (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001), *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001), and *Ziglar*, 582 U.S. at 136).

280.  The national security nexus is much closer here, involving secondary liability for abuses allegedly committed by U.S. soldiers at a war-zone interrogation facility in Iraq.

In *Ziglar*, the Court held that doubts about judge-made claims are particularly acute when "Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere."  582 U.S. at 137.  The Court's first-cited example was "military."  *Id.* This Court recently recognized the federal interest in "preserv[ing] the field of wartime decisionmaking exclusively for the federal government."  *Hencely*, 120 F.4th at 430.  That federal interest is a sound reason to defer to Congress.

Moreover, Congress has enacted only one cause of action under ATS's jurisdictional grant – the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 note.  *Jesner*, 584 U.S. at 265 (plurality opinion).  Congress limited the TVPA to torture and extrajudicial killing **under color of foreign law**, thus excluding claims arising out of U.S. military operations.  28 U.S.C. § 1350 note. Congress also limited TVPA to suits against individuals.  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 451-52 (2012).  Separation-of-powers principles preclude judge-made claims that strike a different balance than Congress struck.  *Jesner*, 584 U.S. at 264-65 (plurality opinion).

Finally, the Secretary of Defense created an administrative claim process for detainee abuse claims.  JA8612; JA284-290; *Saleh*, 580 F.3d at 2.  Alternative remedial processes, even if unavailable to the plaintiff or of uncertain utility,

preclude judge-made claims. *Egbert*, 596 U.S. at 497-98; *Dyer*, 56 F.4th at 280; *Bulger*, 62 F.4th at 140-41.

While this Court has rightly wondered whether a judge-created cause of action is *ever* permissible under current precedent, *Dyer*, 56 F.4th at 277, this case falls squarely within the zone of claims for which judge-made claims are never permissible. This is not the extraordinary case where the judiciary is better equipped than Congress to decide whether to authorize and define a private right of action. The district court committed reversible error in legislating here. Dismissal is required.

### 3.    CACI Is Entitled to Derivative Sovereign Immunity

The district court prevented CACI from pursuing derivative sovereign immunity, holding that the United States impliedly waived immunity from claims alleging *jus cogens* violations. That holding is patently incorrect. CACI meets the requirements for derivative sovereign immunity, requiring dismissal.

### a.    The District Court Erroneously Held the United States Impliedly Waived Sovereign Immunity

"A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text, *and will not be implied*." *Lane*, 518 U.S. at 192 (emphasis added). "Because the power to waive the federal government's immunity is Congress's prerogative, not [the courts']," a court may permit a lawsuit against the government to proceed "only when a statute 'unmistakabl[y]' allows it." *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024) (quoting *FAA v. Cooper*, 566 U.S. 284, 291 (2012)); *Lancaster v. Sec'y of*

*the Navy*, 109 F.4th 283, 293 (4th Cir. 2024) (waiver of sovereign immunity "cannot be implied but must be unequivocally expressed") (citing cases).

The ATS does not waive sovereign immunity, *Goldstar*, 967 F.2d at 968, and no statute waives sovereign immunity for alleged *jus cogens* violations. *Siderman de Blake v. Argentina*, 965 F.2d 699, 719 (9th Cir. 1992); *Quintero v. United States*, 8 F.4th 1095, 1101 (9th Cir. 2021); *Belhas v. Ya'alon*, 515 F.3d 1279, 1287 (D.C. Cir. 2008); *Sampson v. Fed. Rep. of Germany*, 250 F.3d 1145, 1150-51 (7th Cir. 2001); *Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239, 242-45 (2d Cir. 1997).

The district court swept all this precedent aside in a footnote, characterizing precedent as merely "suggesting" that sovereign immunity waivers be "explicit and statutory." JA3974. The district court supported this conclusion through a half-sentence quotation of *Lane*, using ellipses to shear off *Lane*'s admonition that waivers of sovereign immunity "will not be implied." JA3974. When the language omitted by the district court's ellipses is restored, *Lane*'s holding changes entirely.

The district court bypassed more than a century of Supreme Court precedent holding that a waiver of sovereign immunity cannot be implied[10] to hold that "no

---

[10] *See, e.g.*, *Financial Oversight and Mgmt. Br. For P.R. v. Centro De Periodismo Investigativo, Inc.*, 598 U.S. 339, 347 (2023); *Sossaman v. Texas*, 563 U.S. 277, 284 (2011); *Dept. of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999); *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *United States v. Testan*, 424 U.S. 392, 399 (1976); *United States v. King*, 395 U.S. 1, 4 (1969); *United States v. Shaw*, 309 U.S. 495, 497 (1940); *United States v. Thompson*, 98 U.S. 486, 489 (1878).

such categorical rule exists" and that the United States impliedly waived sovereign immunity for allegations of *jus cogens* violations by: (1) "joining the community of nations," (2) "ratifying the Convention Against Torture and assuring the Committee Against Torture that an adequate civil remedy exists for such victims," (3) "participating in the Nuremberg trials and the parallel development of peremptory norms of international law," and (4) "holding itself out as a member of the international community."    JA3987-3997.    This was the epitome of legerdemain.

None of the district court's bases for finding waiver meets the requirement of "statutory text that is unambiguous and unequivocal." *Robinson v. U.S. Dep't of Educ.*, 917 F.3d 799, 802 (4th Cir. 2019).  Not surprisingly, no other court in the history of the Republic has reached the district court's conclusion, which contravenes binding precedent and must be reversed.

### b.    CACI Is Entitled to Derivative Sovereign Immunity

The district court's erroneous sovereign immunity ruling foreclosed CACI's pursuit of derivative sovereign immunity.  Had CACI been allowed to pursue that immunity, it would have qualified.  Under *Yearsley v. W.A. Ross Construction Co.*, 309 U.S. 18, 20-21 (1940), a contractor is derivatively immune if (1) its "authority to carry out the project was validly conferred" by the United States, and (2) its work was "authorized and directed" by the government.  If, however, a contractor "exceed[s] [its] authority" or fails to "comply with all federal directions," it cannot claim *Yearsley* immunity.  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016).

This Court applied these standards in *Cunningham*. Viewing derivative sovereign immunity expansively for government contractors, this Court rejected the argument that the government cannot "validly confer" the authority to engage in conduct that violates the law. The Court held that "[t]he purpose of *Yearsley* immunity is to prevent a government contractor from facing liability for an alleged violation of law, and thus, it cannot be that an alleged violation of law *per se* precludes *Yearsley* immunity." 888 F.3d at 648-49.

CACI presented undisputed evidence that its activities were authorized and directed by the government under validly-conferred authority. Congress vested the President with authority "to use the Armed Forces of the United States as he determines to be necessary and appropriate" to "defend the national security of the United States against the continuing threat posed by Iraq." Authorization for Use of Military Force Against Iraq Resolution of 2002, Pub. L. 107-243, 116 Stat. 1498. Moreover, 50 U.S.C. § 1431 authorizes government agencies to make contracts to facilitate national defense. The record also establishes that the Army directed CACI employees' interrogation activities in every detail. *See* § IV.B.1.

CACI also adhered to the terms of the contracts. Consistent with the Delivery Orders, CACI provided interrogation personnel approved by the Army to be integrated into the military mission and directed by the Army. *See supra* p. 11; *see also* JA633, JA635, JA7376-7377, JA8588, JA9673-9674, JA8501-8502, JA8508-8509. CACI provided only administrative support. *See* § IV.B.1, *supra*. The contract requirements that the military control interrogation operations, including work by CACI interrogators, were consistent with regulations

34

prohibiting contractors from performing "inherently governmental functions," such as directing and controlling "intelligence and counter-intelligence operations." 48 C.F.R. 7.503(a), (c)(8); *see* JA7343-7346. Notably, the United States has never alleged in any context that CACI breached the contracts.[11]

In short, CACI fully complied with its contractual and legal obligations and is entitled to derivative sovereign immunity.

### 4. Plaintiffs' Claims Implicate Nonjusticiable Political Questions

Federal courts lack subject-matter jurisdiction to adjudicate political questions. *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 407 n.9 (4th Cir. 2011). "'Most military decisions are matters solely within the purview of the executive branch' and therefore present nonjusticiable political questions." *Hencely*, 120 F.4th at 422 (quoting *Burn Pit II*, 893 F.3d at 259). "[T]he Constitution delegates authority over military affairs to Congress and to the President as Commander in Chief." *Id.* (quoting *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012)). "It contemplates no comparable role for the judiciary," and "judicial review of military decisions would stray from the traditional subjects of judicial competence." *Id.*

---

[11] "[T]he government acted swiftly to institute court-martial proceedings against offending military personnel, but no analogous disciplinary, criminal, or contract proceedings have been instituted against the defendants. This fact alone indicates the government's perception of the contract employees' role in the Abu Ghraib scandal." *Saleh*, 580 F.3d at 10.

A "controversy is nonjusticiable where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department.'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)). As this Court recently held, "Article III courts best uphold their place in our constitutional system by deferring to their legislative and executive partners who possess 'textually demonstrable constitutional commitment[s]' of military authority." *Dorado-Ocasio*, 2025 WL 478406, at *6.

Just as the Constitution assigns the Federal Judiciary responsibility for certain matters, *see, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 384-85 (2024), it expressly vests exclusive responsibility for directing military operations in the Executive Branch, especially in time of war, and in Congress to declare war and raise armies. The Constitution assigns no warfighting responsibility to district courts, which this Court recently reaffirmed in *Dorado-Ocasio*.[12]

The district court's rulings, however, suggested no reluctance to pass judgment on the manner in which the United States prosecuted the war in Iraq. This is wholly inconsistent with the separation of powers and exceeded the limits of judicial authority. *See Dorado-Ocasio*, 2025 WL 478406, at *7 ("Federal judges have neither the tactical skills of a Major General planning an operation, nor the logistical talents of a Sargeant Major assisting its execution.").

---

[12] Indeed, Plaintiffs originally sought judgment that U.S. soldiers committed war crimes for which CACI was liable, claims dismissed at the district court's urging.

"[A] suit against a military contractor raises a nonjusticiable political question if either (1) the military exercised direct control over the contractor, or (2) 'national defense interests were closely intertwined with military decisions governing the contractor's conduct, such that a decision on the merits of the claim would require the judiciary to question actual, sensitive judgments made by the military.'" *Hencely*, 120 F.4th at 423 (quoting *Al Shimari IV*, 840 F.3d at 155); *see also Taylor*, 658 F.3d at 411. Both grounds apply here.

The military's control over contractors is direct if it is "plenary" and "actual." *Burn Pit II*, 893 F.3d at 260. Military control is "plenary" when the contractor "had little to no discretion in choosing how" its employees performed their work. *Hencely*, 120 F.4th at 423. "The military's control is not plenary if the military 'provides the contractor with general guidelines' yet leaves the contractor 'discretion to determine the manner in which the contractual duties would be performed.'" *Id.* (quoting *Burn Pit II*, 893 F.3d at 260).

In *Al Shimari IV*, this Court remanded because it concluded the district court relied on "formal" indicia of control rather than actual control. *Al Shimari IV*, 840 F.3d at 157. There has now been a trial. Plaintiffs responded to CACI's evidence of actual control on the ground with regulatory materials – an Army field manual and regulation, neither of which was present at or used at Abu Ghraib – setting forth Plaintiffs' view of how control was *supposed to be* allocated, the exact sort of irrelevant, "formal" indicia of control this Court rejected. *See* § VI.E.2, *infra*. Conversely, the district court correctly observed that the trial evidence of *actual control* was "uncontestable," that CACI supplied interrogators and the Army

directed their performance. JA7753. *See also* § IV.B.1, *supra*. The military's direct operational control over CACI's interrogators requires dismissal.

This case also satisfies the alternative grounds for political-question dismissal, as it "would require the judiciary to question actual, sensitive judgments made by the military." *Hencely*, 120 F.4th at 423. When this Court decided *Al Shimari IV* in 2016, Plaintiffs were asserting direct abuse by CACI employees. Shortly after remand, however, Plaintiffs disclaimed such allegations, JA489, JA618, and the case proceeded to verdict solely on the theory that CACI was liable for abuses by U.S. soldiers. This confirms the nexus between Plaintiffs' claims and military operations and decisions.

Moreover, treatment alleged by Plaintiffs as constituting torture or CIDT, including sleep management, stress positions, isolation, and use of military working dogs (JA7115-7121), was approvable under the IROEs. JA8013. Thus, the trial challenged sensitive military judgments on detainee treatment *by soldiers* and Army-approved interrogation approaches. *See Wu Tien Li-Shou v. United States*, 777 F.3d 175, 181 (4th Cir. 2015) ("[S]electing the proper rules of military engagement is decidedly not our job."). That the district court concluded that it could recharacterize military-approved interrogation techniques as torture or CIDT demonstrates the district court's outsized view of its role in passing judgment on the military's battlefield tactics in the Iraq war.

## C.  Plaintiffs' Claims Are Preempted

The combatant activities exception to the FTCA, 28 U.S.C. § 2680(j), preempts claims arising from **non-federal** tort duties against civilian contractors whose employees are "integrated into combatant activities over which the military retains command authority." *Hencely*, 120 F.4th at 426.  This reflects the federal interest in eliminating non-federal tort regulation of the military during wartime and "preserv[ing] the field of wartime decisionmaking exclusively for the federal government." *Id.* at 426, 430.  The combatant activities exception is among the broadest in the law.  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 489-90 (2006).  The district court dismissed *Hencely* as preempting *state-law* tort duties only, which altogether ignores *Hencely*'s broader holding.  *Id.*

*Hencely* applied the preemption test from *Saleh*, 580 F.3d at 16, in which the D.C. Circuit held preempted detainee abuse claims against CACI under state law *and the ATS*.  *Saleh* held that ATS claims arise from *international-law* tort duties which, like state-law tort duties, are subject to federal preemption:

> If we are correct in concluding that state tort law is preempted on the battlefield because it runs counter to federal interests, the application of international law to support a tort action on the battlefield must be equally barred.

*Id.*

*Hencely* compels judgment for CACI.  Recognizing that it and other courts "extended the logic" of the government contractor defense to combat-related suits

against contractors,[13] the Court held that "when it comes to warfare, the federal government occupies the field and its interest in combat is always precisely contrary to the imposition of a non-federal tort duty." *Hencely*, 120 F.4th at 426 (internal quotations omitted).

Accordingly, *Hencely* reaffirmed the *Saleh* preemption test:

> [D]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.

*Hencely*, 120 F.4th at 426 (quoting *Burn Pit*, 744 F.3d at 349).

This Court agreed with *Saleh* that the preemption test "allows the contractor to exert *some* limited influence over an operation, as long as the military retain[s] command authority." *Hencely*, 120 F.4th at 426 (quotations omitted). While Fluor had "some discretion," including the power to deny tools to Local Nationals and to monitor employees' performance and fire them, this did not defeat preemption because the military retained overall command authority. *Id.* at 429.

Plaintiffs' claims, like the state-law claims in *Hencely*, arise from ***non-federal*** tort duties – international-law tort duties. *Sosa*, 542 U.S. at 720 ("the ATS to furnish[es] jurisdiction for a relatively modest set of actions alleging violations

---

[13] *Hencely*, 120 F.4th at 426 (citing *Saleh*, 580 F.3d at 9, *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 127-28 (2d Cir. 2021), *Harris v. KBR, Inc.*, 724 F.3d 458, 480-81 (3d Cir. 2013), *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 350-51 (4th Cir. 2014) ("*Burn Pit*"), and *Koohi v. United States*, 976 F.2d 1328, 1337 (9th Cir. 1992)).

of the law of nations"). Indeed, the district court limited CACI's examination of Plaintiffs' "torture" expert, holding that Plaintiffs' claims "alleged violations of international law" to which federal law is "not relevant." JA5836-5837.

A claim arises under federal law if "federal law creates the cause of action" or "the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 690 (2006). ATS creates no causes of action, federal or otherwise, *Sosa*, 542 U.S. at 724, and, as the district court noted, Plaintiffs' claims turn on tort duties under *international law*, not federal law.

Moreover, even if Plaintiffs' claims arose out of a federal tort duty, federal statutory law occupying a field displaces federal courts' common-law powers in that area. *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 426 (2011); *Milwaukee v. Illinois*, 451 U.S. 304, 314 (1981). *Hencely* holds that "when it comes to warfare, 'the federal government *occupies the field*' and 'its interest in combat is *always* precisely contrary to the imposition of a *non-federal* tort duty.'" 120 F.4th at 426 (emphasis added) (quoting *Saleh*, 580 F.3d at 7).

After the second trial, the district court acknowledged that ATS claims are grounded in *international-law* tort duties, but held that *Hencely* applied only to state-law claims. JA6463, JA6470-6471. This was error, as it contradicts *Hencely*'s holding that combatant activities preemption extends to "non-federal tort duties." *Hencely*, 120 F.4th at 426. That *Hencely* addressed "non-federal" tort duties reflects *Hencely*'s adoption of *Saleh*'s reasoning, which held state-law *and* ATS claims preempted by the federal interest in shielding combatant activities

41

"from the hindrance of a possible damage suit." *Saleh*, 580 F.3d at 7. International-law tort suits present no less a "hindrance" than state-law claims.

CACI satisfies the test for combatant activities preemption. "[C]ombatant activities" include "not only physical violence, but activities both necessary to and in direct connection with actual hostilities." *Burn Pit*, 744 F.3d at 351 (quoting *Johnson v. United States*, 170 F.2d 767, 770 (9th Cir. 1948)). Battlefield interrogation operations, under regular threat of attack,[14] are "combatant activities." *Hencely*, 120 F.4th at 427 (supervising Local Nationals in war zone was combatant activity).[15]

The Army indisputably exercised "command authority" over the mission into which CACI interrogators were integrated. While some contractor influence over operations is permissible, *Hencely*, 120 F.4th at 426, the district court correctly described the "uncontestable evidence" of military operational control. *See* § IV.B.1, *supra*. In *Saleh*, the D.C. Circuit specifically held that CACI interrogators at Abu Ghraib operated under the command authority of the U.S. Army, 580 F.3d at 6-7, a conclusion supported by the record in this case. Thus, the interrogation mission at Abu Ghraib falls comfortably within the scope of combatant activities preemption.

---

[14] *See* § IV.B.1, *supra*.

[15] *See also Burn Pit*, 744 F.3d at 351 (waste management); *Harris*, 724 F.3d at 481 (maintaining the electrical systems); *Saleh*, 580 F.3d at 6 (interrogation activities by CACI personnel at Abu Ghraib).

### D.    The District Court Erred in Refusing to Dismiss this Case on State Secrets Grounds

The United States invoked the state secrets privilege to prohibit CACI from discovering the identities and backgrounds of military *and CACI* personnel interrogating Plaintiffs and contemporaneous records of Army-approved plans and reports from Plaintiffs' interrogations. *See supra* p. 7.[16]  By refusing to dismiss on state secrets grounds, the district court forced CACI to defend itself with both hands tied behind its back.

"[S]ome matters are so pervaded by state secrets as to be incapable of judicial resolution once the privilege has been invoked." *El-Masri*, 479 F.3d at 306.  If state secrets are the subject matter of the suit or are so central to its resolution that the case cannot be fairly litigated without disclosing them, dismissal is required. *Id.* at 306, 312; *Abilt v. CIA*, 848 F.3d 305, 318 (4th Cir. 2017).  "[F]or purposes of the state secrets analysis, the 'central facts' and 'very subject matter' of an action are those facts that are essential to prosecuting the action or defending against it." *El-Masri*, 479 F.4th at 309.

The "main avenues of defense" against detainee-abuse claims are to show (1) "that [the plaintiff] was not subject to" the treatment alleged; (2) that the "defendants were not involved" in the treatment alleged; or (3) any involvement defendants had "does not give rise to liability." *Id.* at 301.  Once the United States successfully asserted the state secrets privilege, CACI never had a fair chance to

---

[16]  Plaintiffs took no position on whether CACI should be denied this discovery.  JA732-733, JA841, JA881, JA973, JA1017-1018.

try these issues.  Sustaining the state secrets privilege should have been the death knell for this case, but the district court proceeded otherwise.  That denied CACI due process under circumstances where the prejudice is self-evident.

"[T]he fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  Telephonic depositions of anonymous interrogators with questions about identity, experience, and individual interrogations prohibited, and crucial documents about Plaintiffs' interrogations withheld, denied CACI any meaningful opportunity to present a defense.  CACI had liability for detainee abuse at Abu Ghraib at stake.  It was denied the meaningful ability to contest Plaintiffs' allegations, creating an unacceptably-high risk of due process deprivation, and this was done where the Government had no interest that was implicated after the state secrets privilege was sustained.

This Court confronted this situation in *Wikimedia Foundation v. NSA*, 14 F.4th 276 (4th Cir. 2021).  There, the trial court sustained the NSA's assertion of the state secrets privilege regarding a surveillance program.  This left the NSA without the ability to defend itself, as no conceivable defense could avoid revealing how the program worked.  This Court ruled those circumstances required dismissal:

> We . . . can't condone holding a one-sided trial. . . .  And
> given that the government's hands are so clearly tied by
> state secrets, "it would be a mockery of justice for the
> court" to permit Wikimedia to substantiate its claims by
> presenting its half of the evidence to the factfinder as if it
> were the whole.

*Id.* at 304 (citations omitted).  Yet this is the posture the district court's ruling forced on CACI

Al-Ejaili and Al-Zuba'e testified live to abuse during and surrounding interrogations.  The nine interrogators and interpreters participating in Plaintiffs' interrogations denied such abuse occurred.  *See* § IV.B.2, *supra*.  But CACI was forced to present these witnesses through nearly-useless pseudonymous telephone depositions in which the deponents' identities, backgrounds, training, and experience were withheld.  The inability to view witnesses and assess their demeanor severely impairs a factfinder's ability to judge credibility.  *See Agosto v. INS*, 436 U.S. 748, 755 (1978); *Djondo v. Holder*, 496 F. App'x 338, 342 (4th Cir. 2012) (citing *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 623 (1993))).  The government withholding interrogation plans and reports further hamstrung CACI's rebuttal of Plaintiffs' testimony about their interrogations.

Other evidentiary rulings magnified CACI's prejudice.  Rulings on "background" evidence allowed Plaintiffs to present whitewashed backgrounds to "humanize" themselves, while prohibiting CACI from proving Plaintiffs' motivation to lie because it reflected negatively on their characters.  *See* pp. 8-9, *supra*.  State secrets prevented CACI from "humanizing" the interrogators who

45

contradicted Plaintiffs' testimony. *See supra* p. 7. Moreover, Plaintiffs were permitted to present a trial theme that *some* CACI interrogators were undertrained, only conceivably relevant if the supposedly-undertrained interrogators affected Plaintiffs' treatment. But state secrets prevented CACI from proving the training and experience of CACI interrogators who *actually* interacted with Plaintiffs. *See supra* pp. 9-10.

The state secrets privilege unfairly prejudiced CACI in other ways. Withholding Plaintiffs' interrogation records undermined CACI's borrowed servant defense – CACI could not show the extent of the Army's direction and control specific to Plaintiffs. Withholding interrogator identities made it impossible for CACI to pursue its third-party "John Doe" claims against Plaintiffs' interrogators.

*El-Masri* requires dismissal. In a detainee abuse case against CIA personnel and civilian contractors, this Court affirmed dismissal of ATS and *Bivens* claims because the defendants could not fairly defend themselves without evidence about plaintiff's treatment and the "means and methods" used by those interacting with him. 479 F.3d at 306. This is *exactly* the information CACI was denied. There is no principled basis for dismissing *El-Masri* while allowing this case to proceed.

E.    **The District Court Erroneously Instructed the Jury and Improperly Denied CACI Judgment on Its Borrowed Servant Defense**

1.    **Supplemental Instruction No. 1 Misstated the Law**

In *Alvarez*, this Court explained that an individual, employed by one principal, may "with respect to particular work," be transferred to the service of a third person so that he becomes the servant of the third person "with all the legal consequences of the new relation." 96 F.4th at 694. That is, the borrowing employer alone becomes liable for the servant's tortious acts. *Id.* The district court's supplemental jury instruction on the borrowed servant doctrine contradicted *Alvarez* and constitutes reversible error.

*Alvarez* directs "inquiry [into] whose work is being performed," determined "by ascertaining who has the power to control and direct the servants in the performance of their work." *Id.* (citations omitted). The borrowed servant doctrine acknowledges that the servant of "A" may, for a particular purpose, be the servant of "B", although he continues to be employed and paid by "A."

The district court's original borrowed servant instruction correctly required the jury to determine "under whose direction and control were [CACI] employees when they engaged in the alleged misconduct." JA6383. This instruction was fatal to Plaintiffs' claims, as the military directed and controlled interrogation work at Abu Ghraib. *See* § IV.B.1. Plaintiffs objected *ad nauseam*, *see, e.g.*, JA7639-7640, and requested an erroneous "dual servant" instruction that demanded "complete relinquishment of control" for the borrowed servant doctrine to apply, which the district court correctly rejected as inconsistent with *Alvarez*. JA7631.

The district court's adherence to *Alvarez* was short-lived. During deliberations, the jury asked whether "control mean[s] full control or some control?" The district court provided a supplemental instruction:

> It is a question of fact that the jury must decide whether CACI had the power to control the interrogation work being performed by CACI employees at Abu Ghraib when the alleged torture or cruel, inhuman, or degrading treatment occurred. ***Whether the Army alone or both the Army and CACI had this power to control is a factual question that you must decide***.

JA6398 (emphasis added). CACI objected that this instruction incorrectly suggested that any ability to control defeats the borrowed servant defense. JA7760-7761 (citing *Huff v. Marine Tank Testing Corp.*, 631 F.2d 1140 (4th Cir. 1980)). CACI, like any employer, had the ability to hire, fire, or discipline employees. The borrowed servant doctrine looks to the extent of control over the details of the work. The work here was interrogation of hostile adversaries, which the Army indisputably controlled. The district court's supplemental instruction did not adequately advise that the relevant direction and control relates only to the manner in which CACI employees performed the interrogation mission.

The supplemental instruction also failed to instruct the jury what to do if it found both the Army and CACI had *some* power to control. The district court believed that "if they're an intelligent jury . . . that power to control would I think ***automatically mean small instances of some control would not be enough***." JA7761-7762 (emphasis added). The district court rejected CACI's request to

include this clarification.  JA7762.[17]  The district court's prediction that the jury would infer that *some* control was not enough proved overly optimistic.

The supplemental instruction incorrectly suggested that any power to direct an interrogator defeated CACI's defense.  For example, CACI informed its employees that they would be required to observe the Geneva Conventions in Iraq.  But a borrowing employer's authority "does not have to extend to every incident of an employer-employee relationship."  *Ladd v. Rsch. Triangle Inst.*, 335 F. App'x 285, 288 (4th Cir. 2009); *see Alvarez*, 96 F.4th at 694; *Huff*, 631 F.2d at 1142 (on-site supervisor from lending employer insufficient to overcome borrowed servant defense).  "The question is whether . . . the [contractor] furnished its employees to the United States and placed them under its control in the performance of the work; or whether, on the other hand, the company undertook to do the work through its own servants, retaining direction and control over them."  *McLamb v. E. I. Du Pont De Nemours & Co.*, 79 F.2d 966, 968 (4th Cir. 1935); *see also Huff*, 631 F.2d at 1142.  Contrary to the supplemental instruction, this is a binary determination.

The district court's error was not harmless.  Juries are presumed to follow courts' instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).  The erroneous instruction was decisive, as the jury returned just minutes later for guidance on punitive damages.  JA7762-7763.

---

[17] CACI requested a corrective instruction, JA6209-6211, which the district court never gave.

49

A supplemental instruction is also deficient if it does not sufficiently respond to the jury's question. *United Med.*, 989 F.2d at 1407. The jury asked whether it should determine who had "full control or some control" over CACI interrogators. The supplemental instruction ignored that question, and failed to advise that the borrowed servant doctrine examines who was better positioned to exercise control over the work to reduce the injury risk to others. Restatement (Third) of Agency § 7.03 (2006).

The erroneous supplemental instruction, by itself, ordinarily would entitle CACI to a new trial. But the evidence was overwhelming such that CACI was entitled to judgment as a matter of law on its borrowed servant defense.

### 2. The District Court Erred in Denying CACI Judgment on Borrowed Servant Grounds

There was no legally-sufficient basis for a properly-instructed jury to reject CACI's borrowed servant defense. The Delivery Orders required supervision by the military chain of command. The trial evidence showed that the Army in fact directed and controlled CACI employees as to the details of their work. The Army chain of command treated CACI and Army interrogators identically for operational matters. *See* § IV.B.1.

A legal sufficiency analysis "requires [the Court] to first excise any evidence that was erroneously admitted" because "[i]nadmissible evidence contributes nothing to a 'legally-sufficient evidentiary basis.'" *Sardis v. Overhead Door Corp.*, 10 F.4th 268, 279 (4th Cir. 2021) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 453-56 (2000)). All Plaintiffs offered to overcome "uncontestable

evidence" of military control were a field manual and regulation – *never implemented at Abu Ghraib*[18] and admitted over objection – supposedly prohibiting or discouraging Army supervision of contractor employees. JA8310-8433, JA8456-8479, JA5713-5714. CACI was forced to respond with regulations prohibiting contractors from controlling intelligence activities. JA8668-8671, JA7342-7346. The district court's detour down a regulatory rabbit hole transformed a straightforward question of fact into a convoluted and irrelevant question of law that the jury was unequipped to decide.

Borrowed servant analysis rests on the *actual* power to direct how work is done, not whether control was legal or advisable. *Alvarez*, 96 F.4th at 693-94 (citing *Standard Oil Co. v. Anderson*, 212 U.S. 215 221-22 (1909)); *Huff*, 631 F.2d at 1142. It is, therefore, not surprising that – despite Plaintiffs' regulatory exhibits – many cases have held the military to be the borrowing employer of contractors. *See, e.g.*, *McLamb*, 79 F.2d at 968-69; *Al-Khazraji v. United States*, 519 F. App'x 711, 714 (2d Cir. 2013); *Luna v. United States*, 454 F.3d 631 (7th Cir. 2006). Absent Plaintiffs' irrelevant, misleading, and erroneously-admitted regulatory evidence, there was insufficient evidence to support the jury's verdict.

## F. The District Court Erred in Not Granting CACI Judgment on Plaintiffs' Conspiracy Counts

Plaintiffs presented a legally-insufficient co-conspirator liability theory, supported entirely by inadmissible evidence. Though conspiracies may be broad-

---

[18] JA6234-6235 (Colonel Pappas had never seen the field manual).

ranging in time, scope, and participants, they require an *agreement* to perform unlawful acts. *Edwards v. Am. Med. Ass'n., Inc.*, No. 23-2026, 2025 WL 444424, at *6 (4th Cir. Feb. 10, 2025) (quoting *Marshall v. James B. Nutter & Co.*, 758 F.3d 537, 541 (4th Cir. 2014)). Using a conspiracy claim to reach beyond the range of activity supported by the evidence is reversible error. *Beck*, 529 U.S. at 504. That is what happened here.

The district court allowed Plaintiffs to proceed under what it called a "shaky" conspiracy theory that a few CACI interrogators mistreated a few other detainees or directed soldiers to do so, which somehow "created the environment in which some other people, other actors, did, in fact, rough up the [P]laintiffs." JA4584. That theory is worse than "shaky"; it is legally infirm, sweeping in parallel conduct supposedly caused by a malign "environment" but not in service of a conspiratorial agreement.

A jury "may infer conspiracy from the facts and circumstances of the case," *United States v. Dennis*, 19 F.4th 656, 669 (4th Cir. 2021), but a plaintiff must present evidence supporting that inference. *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). The Plaintiffs presented ***no*** evidence from which the jury could reasonably infer an agreement between CACI and soldiers to abuse detainees. There was no evidence that anyone with authority to bind CACI joined the company into a conspiracy or that any such person *ever* communicated with the military about detainee treatment. Indeed, all communications regarding detainees occurred *in Iraq* between lower-level CACI personnel (*i.e.*, interrogators) and the military. The evidence at trial supported *at most* a finding of parallel conduct by a

52

few low-level employees.  Using interrogation approaches authorized in the IROEs is not conspiratorial conduct.

Plaintiffs' conspiracy theory never should have gone to the jury, as "parallel conduct and a bare assertion of a conspiracy are not enough for a claim to proceed."  *Thomas v. Salvation Army S. Territory*, 841 F.3d 632, 637 (4th Cir. 2016); *A Soc'y Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (same).  "[W]hen concerted conduct is a matter of inference, a plaintiff must include evidence that places the parallel conduct in context that raises a suggestion of a preceding agreement as distinct from identical, independent action."  *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 278 (4th Cir. 2012) (quotations omitted).

Plaintiffs offered no evidence that isolated allegations of abuse against three CACI interrogators – none of which amounted to torture or CIDT – were part of an agreement to abuse Plaintiffs or detainees at large.   The record shows that interrogators only instructed military police regarding their own assigned detainees.   JA5857-5858, JA5918-5919, JA6050-6051, JA6154, JA6984-6985. There is no evidence that any of the three accused CACI interrogators were assigned to Plaintiffs, and the CACI employee most accused testified without contradiction that he was not.  JA6153-6154.  As such, the district court should have granted CACI judgment as a matter of law.

In determining whether there was a legally-sufficient basis for the jury's verdict, the Court cannot consider erroneously-admitted evidence.  *Sardis*, 10 F.4th

53

at 279. The evidence offered on conspiracy was largely inadmissible; any remaining, admissible evidence was insufficient to support the verdict.

Plaintiffs' primary evidence connecting CACI personnel to misconduct consisted of two government reports (the Taguba and Fay reports) brimming with multiple levels of hearsay, often by unidentified declarants. The district court recognized it ruled "significantly in [Plaintiffs'] favor" by admitting the reports, as they were "among the strongest evidence in this case linking CACI people to any misconduct." JA4598. The district court allowed this evidence after erroneously concluding that the hearsay-upon-hearsay throughout these reports mutated into admissible evidence through appearance in a government report. JA4448. But that is not the law.

This Court has long recognized the import of a party's right to confront declarants upon whom investigative reports rely. *McNeill v. Butz*, 480 F.2d 314, 326 (4th Cir. 1973) (reversing where "the government's case was based on the investigative reports, which related the hearsay statements of nameless informers whom [the party] could not confront or cross-examine"). Rule 803(8) covers the *report author's* out-of-court statements, not hearsay statements by others *to the report author*. *Goodman v. Kimbrough*, 718 F.3d 1325, 1333 (11th Cir. 2013) ("[P]lacing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible.") (quotation omitted); *Miller v. Field*, 35 F.3d 1088, 1091 (6th Cir. 1994). A report's repetition of and reliance on second-, third-, and fourth-hand hearsay renders it unreliable. 30B Wright & Miller, *Federal Practice and Procedure* § 6886, at 394-95 (2017)

54

(exclusion of reports as untrustworthy "can easily be the case when portions of a report merely relate hearsay statements made to the investigator by others"). "In a hearsay situation, the declarant is, of course, a witness, and neither this rule nor Rule 804 dispenses with the requirement of firsthand knowledge." Fed. R. Evid. 803, advisory committee note.

The Taguba and Fay reports relied extensively on statements previously taken by the Army Criminal Investigation Division – most with multiple levels of hearsay – of people who were, themselves, under investigation. MGs Taguba and Fay could not evaluate witnesses' credibility, many of whom they never met. JA6973-6976, JA5999, JA7813. Beyond being unreliable, these reports were extraordinarily prejudicial to CACI given the state-secret limitations on CACI's ability to rebut them. Without this unreliable hearsay, there was insufficient admissible evidence to support the verdict.

Indeed, even if Plaintiffs' "shaky" conspiracy theory (JA4584) and hearsay evidence were permissible, the jury's verdict still lacked adequate support. There is no evidence that CACI, the corporation, joined any conspiracy, or explaining why joining a conspiracy would serve a corporate purpose. At most, the trial evidence showed that three CACI interrogators were accused of a few instances of mistreating detainees to whom they were assigned – *i.e.*, not Plaintiffs. No reasonable jury could stretch those unproven allegations to support a corporate conspiracy to torture.

### G.    The District Court Erred in Granting the United States Summary Judgment on CACI's Third-Party Claims

If the United States *had* waived sovereign immunity, CACI would be entitled to recover on its third-party claims. JA549. The district court erred in ruling that CACI released those claims. JA4011.

The release language provides:

> DOI's payment of the Settlement Amount shall constitute full and final payment, settlement, and accord and satisfaction of all claims and disputes by DOI and CACI arising out of or related to the terminated Task Orders . . .

JA3738. This language does not release CACI's claims.

*First*, the release is between CACI and the *Interior Department*. When an agency obtains a release, it ordinarily applies only to claims against that agency. *Holland v. United States*, 621 F.3d 1366, 1384 (Fed. Cir. 2010); *Foreman v. Dep't. of Army*, 241 F.3d 1349, 1351 (Fed. Cir. 2001) (agencies are separate entities for personnel settlements based on their creation under different statutory authorities).

*Second*, CACI's contribution, indemnification, and exoneration claims do not "arise under" or "relate to" CACI's contracts. A release of claims arising out of or relating to a contract reaches only "dispute[s] between the parties having a significant relationship to the contract." *Wachovia Bank, N.A. v. Schmidt*, 445 F.3d 762, 769 (4th Cir. 2006); *Am. Recovery Corp. v. Computerized Thermal Imaging*, 96 F.3d 88, 93 (4th Cir. 1996). Claims do not "relate to" a contract where the "claims will require no inquiry into the [contract's] terms, nor even knowledge of the [contract's] existence." *Wachovia Bank*, 445 F.3d at 768.

CACI's third-party claims involve alleged international-law violations by U.S. soldiers, which are not called for by, or dependent on, any contract. An equitable subrogation claim does not relate to a government contract because it "is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." *Transamerica Ins. Co. v. United States*, 989 F.2d 1188, 1192 (Fed. Cir. 1993). So too CACI's third-party claims. They are common-law claims for which the existence of CACI's contracts is immaterial.

*Third*, a general release only covers future claims when it "expressly refer[s] to future claims or include[s] language that indicates prospective application." *Chevron U.S.A. Inc. v. United States*, 155 Fed. Cl. 344, 352 (2021); 29 *Williston on Contracts* § 73:10 (4th ed.). CACI's third-party claims did not exist when the 2007 settlement was signed.

*Finally*, the district court's decision is internally inconsistent. If *jus cogens* norms are so fundamental that they supersede any deviation or defense, it would make little sense to broadly construe releases addressing other issues to impliedly release *jus cogens* violations by the sovereign. Surely, public policy would require that a release for *jus cogens* violations be explicit. *Fomby-Denson v. Dep't of Army*, 247 F.3d 1366, 1374-75 (Fed. Cir. 2001) (government contracts violating public policy are unenforceable).

**H.    The District Court Erred in Failing to Grant a New Trial or Remittitur on Damages**

While precedents are sparse, it appears that courts borrow forum damages law for ATS claims. *Yousuf v. Samantar*, No. 1:04-cv-1360, 2012 WL 3730617, at *16 (E.D. Va. Aug. 28, 2012). While the district court purported to do so, it disregarded virtually every limiting principle.

**1.    The Jury's Compensatory Damages Award Was Excessive and Speculative**

"Courts scrupulously analyze an award of compensatory damages for a claim of emotional distress predicated exclusively on the plaintiff's testimony." *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1250-51 (4th Cir. 1996). A plaintiff's testimony, without supporting expert diagnosis, is "insufficient to support a sizeable award for emotional distress." *Hetzel v. Cnty. of Prince William*, 89 F.3d 169, 171-72 (4th Cir. 1996).

Plaintiffs alleged no pecuniary damages. Al-Ejaili alleged no lasting physical injuries, JA6734; the other Plaintiffs alleged minor lasting physical injuries. JA6805-6806, JA7199-7201. Plaintiffs' psychological expert appeared on the witness list Plaintiffs filed five days before trial, but Plaintiffs did not call him. JA5811, JA6702-6704, JA6734-6735, JA6805-6806, JA6810-6812, JA7199-7201, JA7230-7232. With no diagnosis of emotional injury, only minimal damages may be awarded. *Hetzel*, 89 F.3d at 171. The district court erred in entering judgment on the jury's sizeable damages award.

## 2.    The Jury's Punitive Damages Awards Are Precluded by Binding Precedent, Unconstitutional, and Excessive

The district court erred in entering judgment for punitive damages.

*First*, "punitive damages may be awarded against a corporate employer only if (1) that employer participated in the wrongful acts giving rise to the punitive damages, or (2) that employer authorized or ratified the wrongful acts giving rise to the punitive damages." *A.H. v. Church of God in Christ*, 831 S.E.2d 460, 478 (Va. 2019); *see also Ward v. AutoZoners, LLC*, 958 F.3d 254, 264 (4th Cir. 2020). There is no evidence that managerial-level CACI employees joined or ratified a torture conspiracy.

*Second*, while punitive damages may be based on "profits improperly derived," *Yousuf*, 2012 WL 3730617, at *16, the jury's award equals CACI's *revenues* from Technical Services Support, *i.e.*, providing employees to work all over Iraq. JA8540, JA8575. Only a "small amount" of the revenues represented profit. JA7431-7432. It was Plaintiffs' burden to quantify CACI's profits. *Cf. Projects Mgmt. Co. v. DynCorp Int'l*, 584 F. App'x 121, 122 (4th Cir. 2014); *Sunrise Continuing Care, LLC v. Wright*, 671 S.E.2d 132, 135 (Va. 2009). They did not. The district court erred in entering judgment on revenue-based punitive damages.

*Third*, the judgment improperly awards punitive damages for injuries to others. The jury sought to direct punitive damages to a non-profit to benefit *other Abu Ghraib victims*. JA7775. The district court told the jury that was not allowed, without instructing that the jury could not shift to Plaintiffs punitive damages it

59

earmarked for others, and without disclosing the jury's question. This prevented CACI from requesting an instruction that due process prohibits punitive damages for injuries suffered by others. *Philip Morris USA v. Williams*, 549 U.S. 346, 353-54 (2007).

*Fourth*, in ATS cases, "punitive damages are typically governed by state law to comply with due process." *Yousuf*, 2012 WL 3730617, at *15; *see Gregg v. Ham*, 678 F.3d 333, 343 (4th Cir. 2012); *Sines v. Hill*, 106 F.4th 341, 344 (4th Cir. 2024) (rejecting argument limiting cap to "run-of-the-mill tort claims."). Virginia caps punitive damages at $350,000. Va. Code Ann. § 8.01-38.1. The district court, without explanation, failed to apply this cap, something CACI could not present unless a jury awarded punitive damages in excess of the cap.

## VII.  CONCLUSION

The Court should vacate the final judgment and remand with instructions to dismiss for lack of subject-matter jurisdiction. Lacking jurisdiction, the district court's other rulings are null and void.

Respectfully submitted,


*/s/   John F. O'Connor*
John F. O'Connor
Linda C. Bailey
Joseph T. McClure
STEPTOE LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-3000 – telephone
joconnor@steptoe.com
lbailey@steptoe.com
jmcclure@steptoe.com

Nina J. Ginsberg
GREENSPUN SHAPIRO
  GINSBERG & YANG, P.C.
3955 Chain Bridge Road, 2nd Floor
Fairfax, Virginia 22030
(703) 352-0100 – telephone
njg@greenspunlaw.com

*Counsel for Appellant CACI Premier*
*Technology, Inc.*


March 3, 2025

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)

I, John F. O'Connor, hereby certify that:

1.      I am an attorney representing Appellant CACI Premier Technology, Inc.

2.      This brief is in Times New Roman 14-pt. type.  Using the word count feature of the software used to prepare the brief, I have determined that the text of the brief (excluding the cover page, table of contents, table of authorities, certificates of compliance and service, and signature block) contains 14,499 words.[19]

*/s/   John F. O'Connor*

---

[19] By Order dated January 29, 2025 (Doc. 24), the Court enlarged Appellant's word limit to 14,500 words.

xiv

## CERTIFICATE OF SERVICE

I hereby certify that on this 3rd day of March, 2025, I caused a true copy of the foregoing to be filed through the Court's electronic case filing system, which automatically serves a true copy of the foregoing on all counsel of record.

/s/  John F. O'Connor