NO. 25-1043

# United States Court of Appeals
## for the
# Fourth Circuit

SUHAIL NAJIM ABDULLAH AL SHIMARI; SALAH HASAN NUSAIF
JASIM AL-EJAILI; ASA'AD HAMZA HANFOOSH AL-ZUBA'E,

*Plaintiffs-Appellees,*

– and –

TAHA YASEEN ARRAQ RASHID; SA'AD HAMZA
HANTOOSH AL-ZUBA'E,

*Plaintiffs,*

– v. –

CACI PREMIER TECHNOLOGY, INCORPORATED,

*Defendant and 3rd-Party Plaintiff-Appellant,*

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

## SUPPLEMENTAL BRIEF OF PLAINTIFFS-APPELLEES

BAHER AZMY
KATHERINE GALLAGHER
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464

MICHAEL F. BUCHANAN
ANDREW I. HADDAD
ALEXANDRA E. MAHLER-HAUG
JAMES J. MAYER
PATTERSON BELKNAP WEBB
   & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

*Attorneys for Plaintiffs-Appellees*

– and –

TIMOTHY DUGAN; CACI INTERNATIONAL, INCORPORATED;
L-3 SERVICES, INCORPORATED,

*Defendants,*

– v. –

UNITED STATES OF AMERICA; JOHN DOES 1-60,

*Third Party Defendants-Appellees.*

PROFESSOR DEBORAH A. DEMOTT; SCHOLARS OF FEDERAL
COURTS; PROFESSORS OF LEGAL HISTORY; FORMER
MILITARY LEADERS AND LAWYERS,

*Amicus Supporting Appellee.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

I.    CACI'S TORTS CORRESPOND TO PIRACY .............................................3

    A.    *Cisco* Permits Causes of Action for Torts Corresponding to
        Piracy ....................................................................................................3

    B.    This Court Has Already Concluded that CACI's Torts Are
        Commensurate with Piracy ...................................................................4

    C.    CACI's Torts Correspond to Piracy ......................................................5

II.   FOREIGN POLICY CONCERNS AND THE U.S. GOVERNMENT'S
    POSITION IN THIS CASE SUPPORT AFFIRMING PLAINTIFFS'
    CLAIMS ..................................................................................................12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al Shimari v. CACI Premier Tech., Inc.*,
170 F.4th 162 (4th Cir. 2026) .........................................................................*passim*

*Al Shimari v. CACI Premier Tech., Inc.*,
758 F.3d 516 (4th Cir. 2014) ....................................................................................14

*The Anna Maria*,
15 U.S. 327 (1817).....................................................................................................*10*

*The Betsey*,
3 U.S. 6 (1794)......................................................................................................*passim*

*Cisco Systems, Inc. v. Doe*,
609 U.S. ___ (June 23, 2026) .............................................................................*passim*

*The Die Fire Damer (Giese)*,
165 E.R. 804 (High Ct. Adm. 1805)............................................................................*10*

*Harmony v. The Cargo of the Brig Malek Adhel*,
43 U.S. 210 (1844)......................................................................................................6

*Jansen v. The Vrow Christina Magdalena*,
13 F. Cas. 356 (D.S.C. 1794)...................................................................................12

*Jesner v. Arab Bank, PLC*,
584 U.S. 241 (2018)...................................................................................................13

*Le Caux v. Eden*,
99 Eng. Rep. 375 (K.B. 1781) ...................................................................................9

*The Lively*,
15 F. Cas. 631 (C.C.D. Mass. 1812) (No. 8,403) ...............................................10

*Moxon v. The Fanny*,
17 F. Cas. 942 (D. Pa.1793)......................................................................................10

ii

*Novion v. Hallett*,
   16 Johns. 327 (N.Y. 1819) ..............................................................10

*Sosa v. Alvarez-Machain*,
   542 U.S. 692 (2004) ...............................................................3, 10, 16

*United States v. Jones*,
   26 F. Cas. 653 (C.C.D. Pa. 1813) .....................................................8

*United States v. Smith*,
   18 U.S. (5 Wheat.) 153 (1820) ..................................................6, 8, 10

**Statutes**

Alien Tort Statute, 28 U.S.C. § 1350 ...............................................*passim*

An Act for the Punishment of Certain Crimes Against the United
   States [1790 Crimes Act], 1 Stat. 113–114 ....................................6, 7

Torture Victims Protection Act, 22 U.S.C. §§ 7101-7112 ......................15

**Other Authorities**

4 Journals of Continental Cong. 11 (1776)..........................................9

Arthur Brown, *A Compendious View of the Civil Law and of the Law
   of the Admiralty*, vol. 2, 461 (2d. ed. 1802).......................................10

*Commensurate*, Merriam-Webster.com, https://www.merriam-
   webster.com/dictionary/commensurate ...........................................4

Commensurate, Oxford English Dictionary,
   https://www.oed.com/dictionary/commensurate_adj?tab=meaning_
   and_use&hide-all-quotations=true&tabbed-view=false#8731944 ......4

Emmerich de Vattel, *The Law of Nations; or Principles of the Law of
   Nature: Applied to the Conduct and Affairs of Nations and
   Sovereigns* (1758) ...........................................................................5, 11

H.R. Rep. No. 102–367 (1991)..........................................................15

H.R. Res. 627 ................................................................................14

*Indictment of Benjamin Blackledge* (1694), *in* John Franklin Jameson, *Privateering and Piracy in the Colonial Period* (1923)........................................7

Richard Woodeson, *A Systematical View of the Laws of England, lect. 34. vol.* 2. § 422 (1792) .....................................................................................8

S. Res. 356, 108th Cong. (2004) .............................................................................14

White House, Press Release, President Bush Meets with Al Arabiya Television, 2004 WLNR 2540883 (May 5, 2004)...............................................14

William Blackstone, Commentaries on the Laws of England (1769) ..............*passim*

Wynham Beawes, *Lex Mercatoria Rediviva* (1771).....................................................6

iv

Plaintiffs-Appellees Suhail Al Shimari, Salah Al-Ejaili, and Asa'ad Al-Zuba'e (collectively "Plaintiffs"), respectfully submit this supplemental brief addressing the effect on this appeal of the Supreme Court's decision in *Cisco Systems, Inc. v. Doe*, 609 U.S. ___ (June 23, 2026).

## INTRODUCTION

The Supreme Court in *Cisco*, while holding that "courts may not create *new* causes of action for violations of international norms," slip op. 1 (emphasis added), explicitly acknowledged the viability of a case brought under the Alien Tort Statute ("ATS") "for *torts corresponding to* the Blackstone three," which includes piracy, *id.* at 12 (emphasis added). The conduct at issue in this case is so egregious that it violates eighteenth century international law norms still preserved under the ATS in addition to those more modern.

As this Court has concluded already, "for purposes of the Alien Tort Statute," CACI's "acts of torture [are] commensurate with acts of piracy" and CACI is a "modern-day pirate[]." *Al Shimari v. CACI Premier Tech., Inc.*, 170 F.4th 162, 178 (4th Cir. 2026) ("*Al Shimari VI*"). When the ATS was enacted, piracy was understood to mean private actors committing (or conspiring to commit) violent acts with a profit motive and wanton cruelty on the high seas, unauthorized by any sovereign. Likewise, CACI, (i) a company that went to Abu Ghraib in pursuit of profits, (ii) abused helpless detainees (iii) without sovereign authorization (iv) in a

1

place beyond the jurisdiction of any foreign sovereign (like the high seas). Indeed, the sovereign on whose behalf CACI purported to act (the United States) has condemned CACI's conduct and advocated in this Court for this case to proceed.

Thus, as this Court has found, like in cases against pirates and unlike in *Cisco*, *cf.* slip op. 8-9, courts "run no risk of offending any sovereign by imposing the sovereign will of the United States" to CACI's tort, *Al Shimari VI* at 178, "this suit furthers the principal objective of the ATS," and "the greatest threat to foreign relations results if this case were *not* permitted to proceed," since it seeks a "remedy [for] foreign nationals who were tortured" by U.S. citizens. *Id.* at 185-86 (cleaned up).

Because this is the rare case that "would not have detrimental foreign policy consequences," *Cisco*, slip op. 8, and because the unique circumstances of CACI's torts here correspond to piracy, *Cisco* does not disrupt the jury's verdict. Plaintiffs also are not hypothetical "future plaintiffs" relying on "the remote possibility" that a court might create a new cause of action to address a future injury. Slip op. 11. The jury here was correct to see the universal opprobrium of CACI's conduct and to return a verdict to Plaintiffs for the torture by U.S. actors that they suffered.[1]

---

[1] For an overview of the facts and procedural history of this case, *see Al Shimari VI* at 170-72 and, in greater detail, in Plaintiffs' Brief ("Pls' Br.") (Dkt No. 42-1 at 3-22).

## I.     CACI'S TORTS CORRESPOND TO PIRACY

### A.     *Cisco* Permits Causes of Action for Torts Corresponding to Piracy

In *Cisco*, the Supreme Court affirmed that "the ATS gave the district courts 'cognizance' of certain causes of action," even as courts cannot *create* them, *id*. at 7 (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 713 (2004)), and expressly declined to disturb its prior statement in *Sosa* that under the ATS, "causes of action are available for *torts corresponding to* the Blackstone three," *id*. at 12 (emphasis added).

One of the "Blackstone three" is piracy.  *Id.* at 4 (quoting *Sosa*, 542 U.S. at 715).  As *Cisco* reiterated, when the First Congress enacted the ATS, it contemplated "actions arising out of prize captures and piracy."  *Id.* at 12 n.3 (quoting *Sosa*, 542 U.S. at 720).[2]  A cause of action for such conduct is permitted because, as the *Cisco* Court noted, "such torts were understood to be 'found or discovered' by courts rather than 'made or created.'"  *Id.*  (quoting *Sosa*, 542 U.S. at 725).  This language allows for causes of action under the ATS arising out of torts "corresponding" to piracy.

---

[2] *See* Br. of *Amici Curiae* Profs. of Legal Hist. in Supp. of Pls.-Appellees ("Legal Hist. Br."), Dkt. No. 52-1 at 27-32 (discussing views of Jefferson, Randolph, and Bradford as to application of the ATS in 1792 to incidents involving forcible robbery on land and plundering and pillaging in coordination with others).

After *Cisco*, therefore, the question is whether the torts CACI committed "correspond[] to piracy."

## B.     This Court Has Already Concluded that CACI's Torts Are Commensurate with Piracy

This Court has already stated, in the context of extraterritoriality, that CACI is "modern-day pirates" and that "for purposes of the Alien Tort Statute, we may consider acts of torture as commensurate with acts of piracy." *Al Shimari VI* at 178.[3]   The Court reasoned that both torturers and pirates are "enemies of all mankind;" that the "gravity" of their acts, unauthorized by the state, demand that any country prosecute them; and like cases against pirates, United States courts here "run no risk of offending any sovereign" because CACI's conduct "does not implicate the territory of another sovereign." *Id.* (citations omitted).  Accordingly, "even if [Abu Ghraib] was not within the 'territorial jurisdiction' of the United States at the relevant time, its place outside the sovereignty of any country displaces the presumption against extraterritoriality with enough force to allow our courts to prosecute conduct akin to piracy." *Id*.  Thus, the Court has already determined that

---

[3] "Commensurate" is typically defined as "*corresponding* in size, extent, amount, or degree." *Commensurate*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/commensurate (emphasis added); *accord* Commensurate, Oxford English Dictionary, https://www.oed.com/dictionary/commensurate_adj?tab=meaning_and_use&hide-all-quotations=true&tabbed-view=false#8731944.

4

CACI's torts in this case's unique circumstances correspond to piracy in ways relevant to the analysis under *Cisco.*

### C.    CACI's Torts Correspond to Piracy

Eighteenth century understandings show that CACI's acts correspond to piracy. Like a pirate undertaking private acts of violence for personal gain or wanton cruelty, CACI engaged in torture and cruel treatment of detainees at Abu Ghraib to ultimately obtain a financial bounty or otherwise inflict abuses. And CACI's actions were taken without state imprimatur, in a place outside the jurisdiction and territory of any foreign sovereign that was akin to the high seas. *Id.*

Piracy under the law of nations was understood to refer to "those acts of robbery and depredation upon the high seas, which, if committed upon land, would have amounted to felony there." William Blackstone, Commentaries on the Laws of England, bk. 4, ch. 5, p. 72 (1769); *see also* Emmerich de Vattel, *The Law of Nations; or Principles of the Law of Nature: Applied to the Conduct and Affairs of Nations and Sovereigns* at bk. 3, ch. 4, § 68, n.12 (1758). Pirates acted lawlessly for their own gain; as Vattel wrote, pirates engaged in "predatory expeditions, undertaken either without lawful authority or without apparent cause, . . . and solely with a view to plunder." Vattel, bk. 3, ch. 4 § 67.

Piracy necessarily involved use of force or violence without state sanction, primarily for personal gain but also for wanton cruelty or abuses of power. *See*

5

*United States v. Smith,* 18 U.S. (5 Wheat.) 153, 163, n.h. (1820) (quoting and citing Wynham Beawes, *Lex Mercatoria Rediviva*, art. Piracy, at 225 (1771)); *see also The Malek Adhel,* 43 U.S. 210, 232 (1844) (explaining "piratical" in the 1819 Act imported the established understanding under the law of nations about an act that "is unauthorized by the law of nations, hostile in its character, wanton and criminal in its commission, and utterly without any sanction from any public authority or sovereign power," acts that were included in a "class of offences which pirates are in the habit of perpetuating, whether they do it for purposes of plunder, or for purposes of hatred, revenge, or wanton abuse of power"). The inherent violence of piracy was well understood by the First Congress, which deemed those who committed robbery, murder, other capital crimes, and revolts on the high seas to be pirates. *See* An Act for the Punishment of Certain Crimes Against the United States [1790 Crimes Act], § 8, 1 Stat. 113–114 ("if any person or persons shall commit upon the high seas … murder or robbery, or any other offence which if committed within the body of a county, would by the laws of the United States be punishable with death… ; every such offender shall be deemed, taken and adjudged to be a pirate…"); Indeed, unauthorized use of force and violence for profit or simply to mete out cruelty is the hallmark of piracy.

Further, a person who conspired with others to commit piratical acts was also considered a pirate. As Blackstone wrote, actions "in any wise consulting,

6

combining, *confederating, or corresponding with them* [known pirates] … *shall be deemed piracy*: *and all accessories to piracy, are declared to be principal pirates*[.]" Blackstone, Commentaries, bk. 4, ch. 5, p. 72 (emphases added).  So, too, for any sailor who joined his mates and turned pirate.  *See id*. ("And farther, any commander, or other seafaring person, … *conspiring to do these acts; … shall, for each of these offenses, be adjudged a pirate, felon, and robber*, and shall suffer death, whether he be principal or accessory.").  The understanding that confederates of pirates were deemed equally responsible was reflected in colonial courts, which attached liability to those individuals who "did Conspire, Abett, and Joyne [sic]" in piratical activities. *See, e.g.*, *Indictment of Benjamin Blackledge* (1694), *in* John Franklin Jameson, *Privateering and Piracy in the Colonial Period* 151–52 (1923).  The First Congress cemented this understanding in the 1790 Crimes Act.  Section 12, "Confederacy to become pirates, how punished," provided:

> [*I*]*f any person or persons shall any ways consult, combine, confederate or correspond with any pirate* or robber on the seas, knowing him to be guilty of any such piracy or robbery; … such person or persons so offending, and being thereof convicted, shall be imprisoned….

1790 Crimes Act § 12 (emphases added).  And liability for confederating with pirates reached beyond what took place on the water.  *Id.* at § 10 ("*all and every such person so as aforesaid aiding, assisting, procuring, commanding, counselling or advising the same, either upon the land or the sea,* shall be … adjudged to be *accessary* [sic]

7

*to such piracies before the fact…*" (emphases added)); *see also Smith,* 18 U.S. at 163, n.h. ("Piracy, according to the law of nations, is incurred by depredation on or near the sea…." (quoting Richard Woodeson, *A Systematical View of the Laws of England, lect.* 34. *vol.* 2. § 422 (1792)). Accordingly, a person who worked with others to commit piracy was also considered a pirate, whether he acted on land or at sea.

CACI's conduct viewed in the context of 18th century privateers further confirms that CACI's acts here correspond to piracy. In the 1700s and 1800s, privateers were, in essence, government contractors. Like pirates, privateers acted for private gain, but, unlike pirates, acted under a letter of marque from a state, which set forth rules of conduct for privateers in exchange for legal protection. *See United States v. Jones*, 26 F. Cas. 653, 656 n.2 (C.C.D. Pa. 1813) ("The words of this learned writer are, 'but whether one be a pirate or not, depends upon the fact, whether he has or not, a commission to cruise.'").

Notably, these rules included prohibiting privateers from engaging in "torture" or treatment of captured persons that was "cruel[], inhuman[], and, contrary to common usage, and the practice of civilized nations in war." *See, e.g.*, 4 Journals of Continental Cong. 11, 253-254 (1776) (approving instructions to "the commanders of private ships … which shall have commissions or letters of marque and reprisal[…]," including "6. *If you, or any of your officers or crew, shall,* in cold

8

blood, kill or maim, or *by torture or otherwise, cruelly, inhumanly, and, contrary to common usage, and the practice of civilized nations in war, treat any person or persons surprized [sic] in the ship or vessel you shall take*, the offender shall be severely punished. […]" (emphases added)); Beawes, *Lex Mercatoria Rediviva*, art. Privateering, at 205-06 (1771) (discussing issue of privateers taking merchant crews and passengers in "an inhuman Manner, tormenting them, thereby to extort from them such Confessions as they would have to be made," and explaining that "such heinous and inhuman Offences" are forbidden, and that any prize with "Mariners or Passengers shall have suffered any Torture" shall be freed).

It was understood that if a privateer failed to adhere to his letters of marque, he risked damages liability.[4]  For example, the Continental Congress's approved privateer instructions from 1776 showcased this obligation: "*If you shall do any thing contrary to these instructions*, or willingly suffer such thing to be done, *you shall* not only forfeit your commission, … but *be responsible to the party grieved for damages sustained by such malversation*."  4 Journals of Continental Cong. 11, 253-54 (emphases added).  Toward that end, a privateer had to post a bond, which could be used for damages arising from the misconduct of the privateer commander

---

[4] *See, e.g.*, *Le Caux v. Eden*, 99 Eng. Rep. 375, 376 (K.B. 1781) (monetary damages awarded for wrongful capture by privateer).

or his crew. *Id*. at 252-53. Caselaw from around this period illustrates how the improper conduct of privateers could lead to liability for damages, including for personal injuries and abuse.[5]

Thus, a privateer who acted in contravention of his commission was considered a pirate, *see Smith*, 18 U.S. at 163 n.h ("Piracy is … transgression of authority by despoiling beyond its warrant." (quoting Arthur Brown, *A Compendious View of the Civil Law and of the Law of the Admiralty*, vol. 2, 461 (2d. ed. 1802)),[6] and could also be liable to his victims for damages caused by his wrongful acts. These suits against privateers acting improperly were viewed as permissible under the ATS at that time, as the Supreme Court has recognized.[7]

Finally, CACI's conduct also corresponds to piracy because its acts here unquestionably do not implicate the territory of another foreign sovereign. At the relevant time, Iraq could be said to be "outside the territory of any other sovereign," as the Court here concluded, *Al Shimari VI* at 178, which entails a sense of

---

[5] Examples of courts discussing and/or awarding damages to victims for abuses inflicted by privateers acting unlawfully include: *The Die Fire Damer (Giese),* 165 E.R. 804 (High Ct. Adm. 1805); *The Lively*, 15 F. Cas. 631 (C.C.D. Mass. 1812) (No. 8,403); *The Anna Maria*, 15 U.S. 327 (1817).

[6] *See also, e.g.*, *The Betsey*, 3 U.S. 6, 7 (1794); *Novion v. Hallett*, 16 Johns. 327, 336 (N.Y. 1819).

[7] *Sosa*, 542 U.S. at 720 (describing *Moxon v. The Fanny,* 17 F. Cas. 942 (No. 9,895) (D. Pa. 1793) and its discussion of the ATS).

10

lawlessness that corresponds to the high seas. But, as this Court also concluded, *id*. 173-78, Abu Ghraib prison during June 2003-June 2004 was also properly deemed to be "territory of the United States." *See Al Shimari VI* at 178. For the relevant legal analysis, these are two sides of the same coin: in *neither* analysis is the sovereignty of a foreign nation implicated. To the extent Abu Ghraib is considered U.S. territory, the 18th century obligation to provide a remedy is heightened significantly, as "this suit furthers the principal objective of the ATS" such that "the greatest threat to foreign relations results if this case were *not* permitted to proceed." *Id*. at 185.[8]

In sum, CACI's conduct here constitutes torts that correspond to piracy. The jury found that CACI conspired with U.S. Army Military Police to "treat [detainees] like shit," in order to "soften them up" for interrogations and "to get them to talk," which resulted in Plaintiffs suffering torture and cruel, inhuman, and degrading

---

[8] And, Abu Ghraib prison being within the territory of the United States supports why CACI's conduct here is actionable under the ATS as torts corresponding to piracy. *See, e.g.*, Blackstone, Commentaries, bk. 4, ch. 5, p. 71 (observing that "every community" has a right to punish pirates). Under the 18th century law of nations, the obligation to redress harms also extended to violations committed within the sovereign's territory or under its governance: it was the sovereign's responsibility "to exercise justice in all the places under [its] obedience, [and] to take cognizance of the crimes committed." Vattel, bk. 2, ch. 7, § 84; *see also* Legal Hist. Br. at 16-26 (describing incidents that informed Founding generation's understanding of the obligation to remediate harms caused by U.S. subjects or on U.S. territory).

treatment. Pls' Br. at 7 (quoting JA5923, JA5888-89); *Al Shimari VI* at 204 (quoting JA5887-89). CACI was acting with a pecuniary motive—but for its lucrative contract (and desire for more business), CACI would not have committed such actions—and its conduct involved acts of wanton and gratuitous cruelty in violation of any U.S. authorization. And at the relevant time, Abu Ghraib prison did not fall within the territory of any foreign sovereign.

Accordingly, Plaintiffs' claims against CACI are permissible under the ATS post-*Cisco*, because they are based on torts corresponding to piracy, which is a cognizable cause of action.[9]

## II. FOREIGN POLICY CONCERNS AND THE U.S. GOVERNMENT'S POSITION IN THIS CASE SUPPORT AFFIRMING PLAINTIFFS' CLAIMS

Plaintiffs' claims do not raise the foreign policy concerns fundamental to *Cisco*'s analysis, namely, "the danger of unwarranted judicial interference in the conduct of foreign policy," slip op. 8. Indeed, the opposite is true here. And,

---

[9] There was an early understanding that the ATS applied to incidents involving forcible robbery on land, wrongful privateering, and plundering and pillaging in coordination with others, which were violations of the law of nations. *See, e.g.*, Legal Hist. Br. at 27-32; *Jansen v. The Vrow Christina Magdalena*, 13 F. Cas. 356, 358 (D.S.C. 1794). These incidents illustrate that a cause of action by aliens for such torts, which *correspond* to piracy, was available under the ATS.

corresponding to the political branches' demand for accountability for the Abu Ghraib abuses, the United States itself has already advocated for this case to proceed.

Permitting *Cisco* to proceed would have risked "serious ramifications" for U.S.-China relations, as it "would necessarily require a showing that the Chinese Communist Party and Ministry of Public Security violated international law." *Id.* at 6-7 (quoting *Cisco*, 73 F.4th at 748 (Christen, J., dissenting in part)). Confronting these issues, the Supreme Court noted that it is "difficult to think of" an ATS case that "would not have detrimental foreign policy consequences" because "[e]ven suits against American defendants (like this one against Cisco) generally require a court to examine allegations of heinous acts committed by foreign nations or individuals." *Id.* at 8-9.

This case is the exception to that general rule. As this Court has already found, this case "does not seek accountability from any foreign government, agents thereof, or foreign citizens." *Al Shimari VI* at 185-86. "Rather, this suit furthers 'the principal objective of the ATS': 'to avoid foreign entanglements by ensuring the availability of a federal forum where the failure to provide one might cause another nation to hold the United States responsible for an injury to a foreign citizen.'" *Id.* at 185-86 (quoting *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 255 (2018)). As this Court emphasized, nothing would be "more offensive to the arena of foreign relations than to proclaim that courts of the United States may not provide a remedy to foreign

13

nationals who were tortured by members of the U.S. military as part of a conspiracy to extract intelligence using universally condemned means of interrogation." *Id.* at 186.

Making this case even more exceptional, and distinct from *Cisco*, is that the U.S. government itself endorsed this case in an *amicus* brief submitted to this Court. There, the United States asserted that "ensuring that military detention operations are conducted in a manner consistent with humane treatment obligations and the laws of war, and ensuring that contractors are held accountable for their conduct by appropriate means" are "uniquely federal interests"; accordingly, "the balance of federal interests in this case therefore ultimately weighs in favor of allowing [*even*] a state-law tort claim to proceed to the extent a civilian contractor actually engaged in torture in violation of federal law." Br. for the U.S. as *Amicus Curiae*, JA5323, 5335, 5343-44. This statement aligns with other statements from the political branches, which condemned the torture in which CACI participated and demanded accountability. President Bush described the abuse as "abhorrent." *Al Shimari v. CACI Premier Tech., Inc.*, 758 F.3d 516, 521 (4th Cir. 2014) (quoting White House, Press Release, President Bush Meets with Al Arabiya Television, 2004 WLNR 2540883 (May 5, 2004)). Both houses of Congress condemned the abuses as violating the "policies, orders, and laws of the United States and the United States military" and "urg[ed] that all individuals responsible for such despicable acts be

14

held accountable." *Id.* (quoting H.R. Res. 627 and S. Res. 356, 108th Cong. (2004)). Indeed, U.S. soldiers who participated in CACI's conspiracy were subject to courts martial and imprisoned. Until this verdict, CACI remained unaccountable for its deplorable conduct.

Additionally, while *Cisco* found that separation-of-powers concerns and the Torture Victim Protection Act ("TVPA")—which creates a remedial structure for torture under color of *foreign law*—cut against permitting the *Cisco* plaintiffs' ATS claim, slip op. 10-11, not so with Plaintiffs' claims. As this Court explained, the TVPA was enacted because "explicit congressional approval is necessary for 'cases likely to impact on U.S. foreign relations.'" *Al Shimari VI* at 185 n.14 (quoting H.R. Rep. No. 102–367, pt. 2, at 4 (1991)); *id.* at 185 (quoting H.R. Rep. No. 102–367, pt. 2, at 3). Here, this Court has already held that the TVPA does not preclude "suits under the ATS for torture perpetuated by *U.S. citizens* against aliens," and unlike *Cisco* or any other case involving "acts of torture under color of foreign law," *id.* at 185 nn. 13 & 14, "this case [*Al Shimari*] does not offend the authority of the other branches of government" because it "lacks *any* potential to negatively affect foreign relations," *id.* at 184-85 (emphasis in original). In any event, *Cisco* stated only that the TVPA "precludes the *creation* of a cause of action," slip op. 10-11, not that it displaces the availability of a cause of action under the ATS for torts corresponding to the Blackstone three.

15

* * *

After suffering horrific abuse at the hands of CACI and its co-conspirators, Plaintiffs were forced to wait nearly two decades for a jury trial, due in part to endless bad-faith delays by CACI (*see* Dkt. No. 23 at 5-8 (detailing CACI's abuse of process in this Court and others)).  In *Cisco*, the Supreme Court expressed its intent not to "upset reliance interests," and stated its expectation that only "future plaintiffs" would be affected.  Slip op. 11.  Clearly, the Supreme Court did not intend to overturn existing jury verdicts in favor of victims like these Plaintiffs, who have relied on *Sosa* and its progeny in pursuing their claims under the ATS for eighteen years.

Plaintiffs respectfully submit that vacating the unanimous jury verdict would be deeply unjust and run counter to the First Congress's purpose in enacting the ATS.  Nothing in *Cisco* requires that this Court disturb its conclusion that this case is a "paradigmatic application of the ATS," *Al Shimari VI* at 185, or displace the measure of justice that the jury provided to Plaintiffs.

July 7, 2026                                  Respectfully submitted,

*/s/ Michael F. Buchanan*

Baher Azmy
Katherine Gallagher
CENTER FOR CONSTITUTIONAL
RIGHTS

16

666 Broadway, 7th Floor
New York, NY 10012

Michael F. Buchanan
Andrew Haddad
Alexandra Mahler-Haug
James Mayer
PATTERSON BELKNAP WEBB &
TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
mfbuchanan@pbwt.com

17

**CERTIFICATE OF SERVICE**

1. This brief complies with the type-volume limitation set by this Court's order dated June 29, 2026 (Dkt. No. 118) because it contains 3,900 words, calculated by the word processing system used in its preparation (Microsoft Word), and excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ Michael F. Buchanan*

Michael F. Buchanan

**CERTIFICATE OF SERVICE**

I certify that on July 7, 2026, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court.

*/s/ Michael F. Buchanan*

Michael F. Buchanan